[842 NYS2d 558]

RANDI A.J., Respondent, v LONG ISLAND SURGI-CENTER, Appellant.

Second Department, September 25, 2007

## APPEARANCES OF COUNSEL

*Murphy & Higgins LLP* (*Mauro Goldberg & Lilling LLP*, Great Neck [*Barbara D. Goldberg* and *Richard J. Montes* of counsel]), for appellant.

*Law Offices of John J. Guadagno, P.C.*, East Islip (*Steinberg & Boyle, LLP* [*Robert G. Steinberg* of counsel]), for respondent.

## OPINION OF THE COURT

FISHER, J.

It is now part of the declared public policy of the State of New York to protect every individual's right to keep medical treatment private and personal and medical records confidential (*see* Public Health Law § 2803-c [1], [3] [f]). As a result, when a state-licensed entity breaches that right—and especially when it does so in connection with a particularly sensitive medical procedure—more may be involved than simply a private wrong.

In the case now before us, a 20-year-old unmarried woman who lived with her parents decided to terminate her pregnancy at the defendant, Long Island Surgi-Center (hereinafter the Center). Because her parents strongly disapproved of premarital sex and were implacably opposed to abortion, she was determined to keep her decision from them. Consequently, when she first contacted the clinic to arrange for the procedure, she provided her cell phone number and gave specific instructions never to call her at home. Nevertheless, a day after the abor-

tion, one of the clinic's nurses telephoned the young woman's home and spoke with a person she knew to be her mother. In the course of the conversation, the nurse revealed information sufficient to allow the mother to conclude that her daughter had had an abortion.

The core question presented on this appeal is whether, in the young woman's subsequent action to recover damages, inter alia, for wrongful disclosure of confidential medical information, it was error for the trial court to submit the issue of punitive damages to the jury. We hold that, under the circumstances of this case, it was not.

I

According to the evidence presented at trial, on October 14, 1999, the plaintiff underwent an abortion at the Center. Upon first contacting the Center the day before, she specifically instructed a member of its staff that her home phone number was not to be used and that all calls to her were to be made to her cell phone number, which she provided. The plaintiff lived with her parents who were practicing Roman Catholics, strongly opposed to both premarital sex and abortion, and she did not want them to know about the procedure.

On the plaintiff's preoperative history and patient questionnaire form, which was filled out on October 13, 1999, the plaintiff's home phone number had been handwritten, then crossed out. The form also listed the plaintiff's cell phone number, as well as her work number. The nurse who filled out the form did not know why the plaintiff's home phone number had later been crossed out, although she conceded that one possibility was that the plaintiff did not want to be contacted there.

The Center's administrator testified that, whenever a patient did not wish to be called at a certain number, the proper practice was for the nurse or admitting clerk to cross it out and write "[n]ot to be called or don't call." Another nurse, however, testified that the practice was simply to write "do not call, patient's requesting" or not to write the number down at all. Two other nurses testified that the practice was to write the number down, without crossing it out, preceded by the notation "do not call at" or "do not call this number." It is undisputed that the Center had no special form to record a patient's instructions regarding confidentiality and privacy, nor did it have any written plan to protect patient confidentiality. In fact, the Center's only written "Confidentiality Policy" consisted of a statement

that "all medical information that relates to and identifies specific individual patients and practitioners is strictly confidential," that "all employees . . . are advised of their responsibility to maintain the confientiality [sic] of all patient information," and that "any breach of confidentiality by an employee may be subject to [sic] termination."

Moreover, it is undisputed that, upon the plaintiff's admission to the Center, administrative personnel used her insurance information to generate preprinted labels that were then prominently affixed to nearly every page of her medical record. The only contact information listed on the labels was the plaintiff's home telephone number, with no mention of the plaintiff's request not to be called there.

In accordance with the Center's procedures, upon the plaintiff's admission to the Center, she read and signed a form listing her rights as a patient. Among them was the right to privacy and confidentiality of her medical information and records. It is undisputed that the plaintiff never waived that right, and never authorized anyone at the Center to discuss her treatment with anyone else.

The plaintiff underwent the abortion without complication and was discharged the same day. Ordinarily, consistent with the requirements of the State Hospital Code (see 10 NYCRR 756.3 [e]), a determination of the plaintiff's blood group and Rh type would be made prior to the procedure, as the results would determine whether she needed an injection of Rh immune globulin within 72 hours of the procedure. However, part of the plaintiff's blood test results was still pending on the day of the abortion, and therefore, upon her discharge, she was told to follow up with her admitting physician as soon as possible to obtain her missing blood test results. As instructed, the plaintiff called the admitting physician the next morning and was told that her blood test results were in and that she would not require the injection. The Center apparently received a faxed copy of the plaintiff's blood test results from her physician at approximately 8:42 that morning, but the information was not entered in the plaintiff's chart.

Later that afternoon, evidently unaware that the blood test results had been received, a nurse at the Center followed her supervisor's instructions to check on whether the plaintiff had obtained her missing blood work "because that was something that was of concern." Using the only telephone number appearing on the preprinted label affixed to the top right corner of the

Center's telephone follow-up form, the nurse called the plaintiff's home. The plaintiff's mother answered and, although the nurse testified that she was well aware that she was speaking not with the plaintiff but with her mother, she nevertheless had a conversation with the mother about the plaintiff. Without explicitly mentioning that the plaintiff had undergone an abortion, the nurse asked the mother, among other things, whether the plaintiff had experienced any vaginal bleeding, and told her that the plaintiff needed to find out her blood group and Rh type. Based upon her conversation with the nurse, the mother concluded that the plaintiff had had an abortion.

The plaintiff immediately complained to the Center regarding the breach of confidentiality. An investigation was subsequently conducted by the New York State Department of Health's Office of Health Systems Management, which determined, inter alia, that the nurse who had called the plaintiff's mother had revealed privileged information without the plaintiff's permission, and that the Center had subsequently failed to respond to the plaintiff's verbal and written complaints. Nevertheless, the nurse in question retained her position with the Center, and her supervisor—who had participated in the Department of Health's investigation—was apparently unaware that the Department had found that the nurse's conduct amounted to a breach of patient confidentiality.

When the plaintiff later commenced this action, asserting causes of action alleging breaches of confidentiality, privacy, and fiduciary duty, and seeking compensatory and punitive damages, the Center conceded liability, and the matter proceeded to trial on the question of damages. The jury awarded the plaintiff the sum of $65,000 for past and future emotional distress and the sum of $300,000 in punitive damages. The Supreme Court denied the Center's motion to set aside the verdict pursuant to CPLR 4404 and entered judgment. The Center appeals, challenging, inter alia, the award of punitive damages.

## II

The Court of Appeals has most recently addressed the question of punitive or exemplary damages in *Ross v Louise Wise Servs., Inc.* (8 NY3d 478 [2007]), a case involving an adoption that occurred in 1961. The plaintiff adoptive parents sued the defendant, an adoption agency, for having intentionally concealed from them the history of schizophrenia and other severe emotional disturbances in the child's biological family. In

defending the action, the agency explained that it had adhered to its policy at the time of not disclosing certain adverse information about a birth family's medical history if doctors were unsure that the conditions or problems in question were hereditary. The agency asserted that, in 1961, when the adoption occurred, it was the belief of its social workers and psychiatrists that a child's mental health depended principally on the way it was nurtured rather than on its birth family's medical history, and that disclosure could adversely affect the bonding between parents and child. It was not until some 20 years after the adoption that New York's Legislature enacted a law requiring that a birth family's medical history be disclosed, inter alia, to pre-adoptive and adoptive parents (see Social Services Law § 373-a). Nearly 15 years after that, the plaintiffs, whose adopted child, now an adult, continued to suffer from mental illness, demanded that the agency disclose the medical history of his birth family. Upon receiving that disclosure, the plaintiffs commenced suit against the agency, seeking compensatory and punitive damages. The Court of Appeals disallowed the claim for punitive damages.

Our dissenting colleagues cite this holding as instructive because, in their view, the adoption agency's conduct was "far more egregious than the negligence at issue in this case, and resulted in far more devastating consequences" (infra at 91). The dissenters observe that, "[d]uring his childhood, [the adopted child] exhibited severe behavioral problems, prompting the plaintiffs to seek psychiatric help for him. As [the child] grew older, his behavior became increasingly violent, and he was eventually diagnosed as a paranoid schizophrenic" (infra at 92). Indeed, as described by the Court of Appeals, although the adoptive parents contacted the agency on several occasions during the child's early years to report his difficulties and ask questions about his family history, the agency continued to withhold the fact that there was a history of schizophrenia on both sides of his family. Following the child's graduation from high school in 1978, the adoptive mother felt compelled to move out of the family home with the couple's younger daughter because she feared for their physical safety. Finally, on one night in 1995, the adoptive father awoke to find his adoptive son about to strike him with a large flashlight. The child was taken to Bellevue Hospital, where he was diagnosed as a paranoid schizophrenic.

This tragic sequence of events would, at first blush, seem to cry out for punitive sanctions against the agency—sanctions

that the Court of Appeals nonetheless would not allow. The reason for the court's decision, however, as the court took pains to point out, was that only one of the plaintiffs' causes of action survived the statute of limitations, and that cause of action alleged acts *committed at the time of the adoption in 1961* and not at any later time. As the Court of Appeals wrote:

> "The complaint here includes a single cause of action for wrongful adoption and fraud at the time of the adoption. There are no separate counts of fraud concerning conduct in later years. Thus, even though no justification may exist, for example, for the Agency's failure to disclose information to the doctors plaintiffs consulted for [the adopted child] in the 1970s, the fraud of wrongful adoption must center on the conduct that induced the prospective parents to accept the child. *Because we cannot conclude from the record that the initial concealment was motivated by malice so as to warrant punitive damages, or that these damages would deter future reprehensible conduct, we limit plaintiffs' potential recovery to compensatory damages*" (*Ross v Louise Wise Servs., Inc.,* 8 NY3d at 491 [emphasis supplied]).

Additionally, our dissenting colleagues take the view that punitive damages are not available here because the conduct complained of was undertaken in good faith and out of concern for the plaintiff's well-being. We agree that the record does not demonstrate a bad-faith, intentional violation of the plaintiff's rights or an act done maliciously with the purpose of causing injury. But we do not read New York law as making proof of bad faith or malicious motive a necessary element of all demands for punitive damages.

New York does not recognize an independent cause of action for punitive damages. Instead, "[a] demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action" (*Rocanova v Equitable Life Assur. Socy. of U.S.,* 83 NY2d 603, 616 [1994]). Demands for punitive damages usually arise in the context of intentional torts such as fraud, libel, or malicious prosecution, and therefore the availability of punitive damages is often discussed in terms of conduct that is intentional, malicious, and done in bad faith. In *Ross v Louise Wise Servs., Inc.,* for example, the sole cause of action in issue was based on wrongful

adoption and common-law fraud, which, as the court noted, required proof, inter alia, of a false representation made with the specific intent to deceive the plaintiff (*see Ross v Louise Wise Servs., Inc.*, 8 NY3d at 488). In other contexts, however, it is well-settled that conduct warranting an award of punitive damages "need not be intentionally harmful but may consist of actions which constitute willful or wanton negligence or recklessness" (*Home Ins. Co. v American Home Prods. Corp.*, 75 NY2d 196, 204 [1990]; *see e.g. Guariglia v Price Chopper Operating Co., Inc.*, 38 AD3d 1043 [2007], *lv denied* 9 NY3d 801 [2007]; *Gruber v Craig*, 208 AD2d 900, 901 [1994]). Such wantonly negligent or reckless conduct must be "sufficiently blameworthy," and the award of punitive damages must advance a strong public policy of the State by deterring its future violation (*Doe v Roe*, 190 AD2d 463, 474-475 [1993]). Indeed, as the Court of Appeals has often said, a principal goal of punitive or exemplary damages is to "deter future reprehensible conduct" by the wrongdoer "and others similarly situated" (*Ross v Louise Wise Servs., Inc.*, 8 NY3d at 489 [citations omitted]; *see Zurich Ins. Co. v Shearson Lehman Hutton*, 84 NY2d 309, 316 [1994]; *Soto v State Farm Ins. Co.*, 83 NY2d 718, 724 [1994]; *Walker v Sheldon*, 10 NY2d 401, 404 [1961]; *see also Suffolk Sports Ctr. v Belli Constr. Corp.*, 212 AD2d 241, 247 [1995]). We decline to hold, as our dissenting colleagues apparently would, that only conduct done with evil motive or in bad faith warrants deterrence through punitive damages. Courts in this state have long recognized that those who, without specifically intending to cause harm, nevertheless engage in grossly negligent or reckless conduct showing an utter disregard for the safety or rights of others, may also be deserving of the imposition of punitive damages (*see e.g. Home Ins. Co. v American Home Prods. Corp.*, 75 NY2d 196 [1990] [products liability action based on failure to warn]; *Giblin v Murphy*, 73 NY2d 769 [1988] [breach of fiduciary duty without proof of outright fraud]; *Fordham-Coleman v National Fuel Gas Distrib. Corp.*, 42 AD3d 106 [2007] [negligent failure to supply fuel under Public Service Law]; *Guariglia v Price Chopper Operating Co., Inc.*, 38 AD3d 1043 [2007], *lv denied* 9 NY3d 801 [2007] [negligence in leaving prescription drugs within reach of toddler]; *Colombini v Westchester County Healthcare Corp.*, 24 AD3d 712, 715 [2005] [negligent failure to keep ferrous materials away from an MRI magnet]; *Sosa v Ideal El. Corp.*, 216 AD2d 128 [1995] [negligent maintenance of elevator]; *Gruber v Craig*, 208 AD2d 900 [1994] [negligent failure to

repair gas pipe]; *Figueroa v Flatbush Women's Servs.*, 201 AD2d 613, 613-614 [1994] [medical malpractice in performance of abortion]; *Doe v Roe*, 190 AD2d at 474-476 [unauthorized disclosure of HIV-status information in violation of Public Health Law]; *Graham v Columbia Presbyt. Med. Ctr.*, 185 AD2d 753 [1992] [negligent abandonment by physician of physically unstable patient during treatment]; *Rinaldo v Mashayekhi*, 185 AD2d 435 [1992] [driving while intoxicated]; *McWilliams v Catholic Diocese of Rochester*, 145 AD2d 904 [1988] [mistreatment of patient in community residence for mentally retarded persons]).

These cases teach that the egregiousness of a tortfeasor's conduct, and the corresponding need for deterrence, cannot be made to depend solely on the tortfeasor's intent or bad faith, but must also take into account the importance of the underlying right or public policy jeopardized by the tortfeasor's conduct. Were it otherwise, courts would be powerless to deter the sort of wantonly reckless or grossly negligent conduct that tramples on the rights of others or puts their safety at risk. And we believe that the more important the right at issue, the greater the need to deter its violation.

We decline to hold that, as a matter of law, the callous, reckless, or grossly negligent disregard of an individual's right to the privacy and confidentiality of sensitive medical information—a right protected by the declared public policy of this State (*see* Public Health Law § 2803-c [1], [3] [f])—cannot be sufficiently reprehensible and morally culpable to support an award of exemplary damages (*see Doe v Roe*, 190 AD2d 463 [1993]). We turn, then, to the question of whether, in this case, the evidence adduced at trial was sufficient to submit the issue of exemplary damages to the jury.

### III

Our dissenting colleagues suggest that the evidence in this case shows, at most, that the Center's policies, while perhaps not perfect, were nevertheless generally adequate, and that the injury to the plaintiff was the result of an isolated mistake committed in good faith by a well-meaning but misguided nurse. We respectfully disagree. To the contrary, there was sufficient evidence here for a rational jury to conclude that the Center's conduct amounted to far more than simple carelessness, but rose to the level of recklessness, gross negligence, and callous indifference to the plaintiff's rights necessary to support an

award of punitive damages. The Center was a medical provider that performed abortions yet had no reasonably effective policy in place to protect the privacy and confidentiality of women who make the often wrenching decision to undergo those highly sensitive procedures. Its failures were numerous and manifest.

First, the Center had no "written plan" to implement the plaintiff's "right to have privacy in treatment and . . . confidentiality in the treatment of personal and medical records" (Public Health Law § 2803-c [3] [f]), as required under Public Health Law § 2803-c (5). Second, the Center's unwritten "no-call" policy was, at best, confusing and poorly understood by the nursing staff. Third, even if the Center had had a coherent written policy that was known to its nurses, the effectiveness of that policy would have been undermined by the admission staff's practice of placing preprinted labels on virtually every page of a patient's medical file without making any effort to determine whether the contact information appearing on those labels was consistent with, or contrary to, the patient's instructions. Fourth, in apparent violation of the provisions of the State Hospital Code (*see* 10 NYCRR 756.3 [e]), the Center performed the procedure and discharged the plaintiff without having first obtained her full blood test results, thereby unnecessarily creating the need to contact her quickly—a need that led directly to the breach of confidentiality. Fifth, although received by the Center on the morning following the plaintiff's discharge, the missing blood test results never found their way into the plaintiff's chart, further contributing to a pressing need to contact her. Sixth, as a consequence of the Center's failure to record the receipt of the blood work, a nurse felt impelled to reach out to the plaintiff and did so using her home number because it was the only telephone number appearing on the label affixed to the Center's telephone follow-up form. And, seventh, the nurse apparently felt unconstrained by any policy of the Center from disclosing confidential patient information to a person she knew to be someone other than the plaintiff.

In the dissenters' view, the foregoing "is wholly lacking in the element of blameworthiness" (*infra* at 94), and no valid line of reasoning and permissible inferences could possibly lead a rational juror to conclude otherwise. We respectfully disagree. While the jury in this case might well have concluded that the Center's conduct was merely careless, that was certainly not the only possible conclusion to be drawn from the evidence—particularly when viewed in the light most favorable to the

plaintiff. And, in our view, the issue of punitive damages need not be taken away from the jury simply because conflicting inferences may be drawn regarding the blameworthiness of the defendant's conduct (*cf. Crane v Bennett*, 177 NY 106, 116 [1904]). "If there is a reasonable basis for an award of punitive damages . . . whether such damages should be awarded and the amount of such award are issues for the jury" (*Doe v Roe*, 190 AD2d at 475; *see Nardelli v Stamberg*, 44 NY2d 500, 503 [1978]; *Pchelka v Loomis-Root, Inc.*, 210 AD2d 889, 889-890 [1994]).

In *Ross v Louise Wise Servs., Inc.*, the adoption agency offered an arguably reasonable explanation for its policy in 1961 of not disclosing the medical and psychological history of the child's birth family. Moreover, an award of exemplary damages in that case would have served no deterrent purpose because, following the conduct complained of, and well before the plaintiffs commenced their action, a law was enacted mandating the very disclosure that had been intentionally denied to the plaintiffs in 1961. Thus, neither the defendant in that case nor other agencies similarly situated were likely ever again to engage in the allegedly tortious withholding from adoptive parents of the medical history of their child's birth family.

In stark contrast, here there was no justification whatsoever offered for the remarkably casual way in which the Center handled the plaintiff's sensitive medical information, and the need to deter other medical providers from engaging in similar conduct could hardly be clearer. We strongly disagree with the dissenters' conclusion that "the imposition of punitive damages in this case is completely unnecessary to deter similar conduct in the future . . . [because] corrective action has already been taken by the Center" owing to the fact that "the Department of Health issued a 'Statement of Deficiencies,' and required the Center to formulate a plan to correct each specified deficiency" (*infra* at 97-98). The dissenters fail to mention that the Center's administrator, who was directly involved in the Department of Health's investigation, had no specific recollection of its findings, and in fact believed—erroneously—that the agency had concluded that the plaintiff's right of confidentiality had not been breached—a belief which may well explain why no disciplinary action was apparently taken against the nurse who spoke to the plaintiff's mother, despite the Center's written policy that "any breach of confidentiality by an employee may be subject to [*sic*] termination." Under these circumstances, we simply cannot share the dissenters' confidence in the deterrent value of regulatory oversight.

Punitive damages may be awarded "for the conscious disregard of the rights of others or for conduct so reckless as to amount to such disregard" (*Hartford Acc. & Indem. Co. v Village of Hempstead*, 48 NY2d 218, 227 [1979]; *accord Welch v Mr. Christmas*, 57 NY2d 143, 150 [1982]). Unlike our dissenting colleagues, we cannot conclude, as a matter of law, that no valid line of reasoning and permissible inferences could possibly lead rational jurors, on this record, to the conclusion that the Center's conduct was so reckless as to amount to a conscious disregard of the plaintiff's rights, or that exemplary damages would not have an important deterrent effect on other medical providers similarly situated (*compare Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978], with *Matter of New York City Asbestos Litig.*, 89 NY2d 955, 956-957 [1997]). Aside from everything else, we are particularly fortified in this view by the substance of the nurse's call to the plaintiff's mother. The dissenters write that "[t]he purpose of [the nurse's] call was both to determine whether the plaintiff was experiencing any adverse effects from the abortion procedure *such as nausea, pain, or dizziness,* and to ensure that she had contacted her doctor's office to obtain her blood test results" (*infra* at 88 [emphasis supplied]). In fact, knowing that she was speaking to the mother of a young woman who had just undergone an abortion, the nurse felt free to ask the mother to remind the plaintiff to find out her blood group and Rh type, and to ask the mother whether her daughter *was experiencing any vaginal bleeding.* In our view, a rational jury could find that the nurse, unconstrained by any practice or policy of the Center, wilfully and in reckless disregard of the plaintiff's rights and expressed wishes, disclosed to her mother that she had had an abortion. Thus, we hold that the question of whether the Center's conduct in this case was merely careless or instead rose to the level of recklessness or gross negligence sufficient to support an award of punitive damages presented a genuine issue of fact for the jury to resolve.

## IV

Although the issue of punitive damages was properly submitted to the jury in this case, a new trial on the issue is nevertheless required because of errors committed by the trial court.

To begin with, the Center was improperly precluded from introducing evidence regarding the absence of past breaches of confidentiality. Whether the injury-producing conduct was an isolated event or only the latest incident in a continuing pattern

of similarly reckless behavior was an important factor to be weighed by the trier of fact in determining whether an award of punitive damages was warranted (*see State Farm Mut. Automobile Ins. Co. v Campbell*, 538 US 408, 419 [2003]; *BMW of North America, Inc. v Gore*, 517 US 559, 576-577 [1996]). Just as evidence of prior similar breaches may have provided some evidence that the Center consciously or recklessly disregarded the plaintiff's rights here by adhering to a procedure known to be flawed, so too evidence of the absence of any prior breaches would have been some evidence that the procedures followed by the Center were not known to be flawed and therefore adherence to them did not constitute the blameworthy conscious or reckless disregard of the plaintiff's rights required for the imposition of punitive damages. Although the existence or absence of prior similar breaches would not have been determinative, the jury should have been allowed to consider such information in assessing the blameworthiness of the Center's conduct.

Moreover, although we are aware that a different view has been expressed by other courts as to the requisite evidentiary standard (*see Matter of Seventh Jud. Dist. Asbestos Litig.*, 190 AD2d 1068, 1069 [1993]; *Greenbaum v Svenska Handelsbanken, N.Y.*, 979 F Supp 973 [1997]), we hold that the trial court "erred in failing to charge the jury that the standard of proof regarding the imposition of punitive damages was clear and convincing evidence" (*Orange & Rockland Util. v Muggs Pub*, 292 AD2d 580, 581 [2002]; *see Munoz v Puretz*, 301 AD2d 382, 384 [2003]; *Sladick v Hudson Gen. Corp.*, 226 AD2d 263, 264 [1996]; *Camillo v Geer*, 185 AD2d 192, 194 [1992]).

Finally, contrary to the Center's contention, the jury's award of compensatory damages was not excessive (*see* CPLR 5501 [c]; *Fareway Hgts. v Hillock*, 300 AD2d 1023, 1024 [2002]; *Bert v Port Auth. of N.Y. & N.J.*, 166 AD2d 351 [1990]), and the Center's remaining contentions are without merit or need not be reached in light of our determination.

Thus, the judgment is modified, on the law, by deleting the provision thereof awarding punitive damages in the sum of $300,000. As so modified, the judgment is affirmed, so much of the order dated March 29, 2005, as denied those branches of the defendant's motion which were to set aside the jury verdict on the issue of punitive damages and for a new trial on those damages is vacated, those branches of the defendant's motion which were to set aside the jury verdict on the issue of punitive dam-

ages and for a new trial on those damages are granted, the claim for punitive damages is severed, and the matter is remitted to the Supreme Court, Suffolk County, for a new trial on the issue of punitive damages and the entry of an appropriate judgment thereafter.

KRAUSMAN, J. (concurring in part and dissenting in part). While I am impressed by the passionate views expressed in the majority's well-written opinion, the single issue that we must determine is whether the facts presented to the jury, when viewed in the light most favorable to the plaintiff, are sufficient to sustain the legal imperative required for the imposition of punitive damages. I conclude, contrary to the view expressed by the majority, that such damages are not legally justified. Accordingly, I would modify the judgment appealed from to eliminate the punitive damages award, rather than remit for a new trial on this issue as my colleagues have agreed to do.

Although many of the relevant facts are set forth in the majority opinion, I highlight some of the testimony presented to the jury for the purpose of providing a more complete picture as to the circumstances underlying this case. At trial, the plaintiff testified that she grew up in Islip, New York, the youngest of five children. The plaintiff's parents are devout Roman Catholics, who strongly disapprove of premarital sex and are morally opposed to abortion. In early 1999, when she was 20 years old and still living at home, the plaintiff began dating a young man who lived in Connecticut. As the plaintiff's relationship with her boyfriend grew more serious, they became intimate. In the fall of 1999, the plaintiff became pregnant, and after considering her options, she decided to have an abortion. The plaintiff's gynecologist scheduled the abortion at the defendant Long Island Surgi-Center (hereinafter the Center).

On the day before the abortion was to take place, the plaintiff spoke to one of the Center's nurses, Jean Davis, who was preparing a preoperative questionnaire. When asked to provide contact numbers, the plaintiff gave the nurse her cell phone number and her work number, noting that the nurse already had the number at her parents' home. The plaintiff testified, however, that she told the nurse to use her cell phone number rather than her home number because she did not want her parents to know about the abortion. On the handwritten preoperative questionnaire completed by nurse Davis, all three of the plaintiff's contact numbers are listed, but the plaintiff's home number is crossed out. However, a printed label bearing the

plaintiff's address and home phone number, which was generated by the Center's admitting clerks, was subsequently pasted on the questionnaire, partially covering up the handwritten cell phone number.

When the plaintiff came in to have the abortion performed on the following day, the Center's nurses realized that her medical chart contained only partial blood test results, and did not indicate whether she had tested positive or negative for the Rh factor. Recovery room nurse Joanne Lazzaro testified that this was of concern because if a patient who tests negative for the presence of the Rh antibody does not have a RhoGAM injection within 72 hours of an abortion, she may have a problem with a future pregnancy. After making repeated phone calls to the lab to obtain the plaintiff's full blood test results, nurse Lazzaro instructed the plaintiff to contact her doctor's office the next day for her test results. While the plaintiff was in the recovery room, nurse Patricia Garcia also advised her that she would be receiving a follow-up call the next day, and allegedly verified the telephone number at which the plaintiff wished to be reached. Nurse Garcia then handwrote the plaintiff's work and cell phone numbers on a follow-up form above another one of the printed labels listing the plaintiff's address and home telephone number. On the follow-up form, the plaintiff's handwritten work number was crossed out, and the phrase "voice mail" was written next to her cell phone number.

On the following day, nurse Julie Kilroy relied upon the contact information listed on the follow-up form by calling the plaintiff at her home number. The purpose of nurse Kilroy's call was both to determine whether the plaintiff was experiencing any adverse effects from the abortion procedure such as nausea, pain, or dizziness, and to ensure that she had contacted her doctor's office to obtain her blood test results. Since the plaintiff was recovering from the procedure at her boyfriend's home in Connecticut, nurse Kilroy spoke to the plaintiff's mother, and advised her that the plaintiff needed to obtain her Rh factor from her lab results. Although nurse Kilroy did not specifically inform the plaintiff's mother of the nature of the procedure she had undergone, the plaintiff's mother surmised that she had had an abortion.

With regard to the Center's confidentiality policies, administrator Katherine Scheuermann testified that only a small number of abortions were performed at the facility each year, but that there was a procedure in place for protecting a patient's

privacy in the case of abortion or other sensitive procedures. The procedure for such circumstances was that the nurse taking information from the patient would cross out a number the patient did not wish to be contacted at, and write either "[n]ot to be called" or "don't call." A similar notation was to be made on the patient follow-up form and as part of the recovery room notes. Nurse Garcia, who handwrote the plaintiff's cell phone and work numbers on the follow-up form, indicated it was her understanding that if a patient requested not to be called at a particular number, the procedure was to write "do not call" next to the number, but not to cross it out. Nurse Kilroy, who made the follow-up call to the plaintiff's home, similarly testified that when a patient requested not to be called at a particular number, the procedure was to write "do not call" on the preoperative and postoperative forms. Nurse Lazzaro, who cared for the plaintiff in the recovery room, explained that "if there was a number we are not allowed to call, we would write it on [the] follow-up form. We would just say: Do not call this number or a number you can call."

The plaintiff testified that her formerly close relationship with her parents became strained after they learned of her abortion, and that her mother's response made her feel guilty and that she had committed a sin. According to a social worker who counseled the plaintiff, the emotional pain and psychological harm caused by the Center's breach of confidentiality were permanent because the breach altered the plaintiff's relationship with her parents. At the conclusion of the damages trial, the jury awarded the plaintiff the sum of $35,000 for past emotional distress and the sum of $30,000 for future emotional distress. The jury also assessed punitive damages against the center in the sum of $300,000.

I concur with the conclusion of my colleagues in the majority that the compensatory damages awarded by the jury for the plaintiff's past and future emotional distress were not excessive. However, I believe that the jury's award of punitive damages should be set aside because such damages are not warranted by the facts of this case.

Punitive damage awards serve two important societal functions: to punish a wrongdoer for morally culpable conduct which goes far beyond mere negligence, and to deter others from engaging in similar conduct (*see Walker v Sheldon*, 10 NY2d 401, 404 [1961]). Such damages are not designed to compensate a plaintiff for the injuries he or she has suffered (*see Home Ins.*

*Co. v American Home Prods. Corp.*, 75 NY2d 196, 203 [1990]). Rather, " '[t]hey are intended as punishment for gross misbehavior for the good of the public' " (*Home Ins. Co. v American Home Prods. Corp.*, 75 NY2d at 203, quoting *Reynolds v Pegler*, 123 F Supp 36, 38 [1954], *affd* 223 F2d 429 [1955]). Punitive damages may thus be considered "expressive of the community attitude towards one who wilfully and wantonly causes hurt or injury to another" (*id.* at 203).

Since a punitive damage award reflects society's condemnation of a wrongdoer, such an award should be "reserved for rare cases exhibiting malice, fraud, oppression, insult, wantonness, or other aggravated circumstances which effect [*sic*] a public interest" (*Laurie Marie M. v Jeffrey T.M.*, 159 AD2d 52, 58 [1990], *affd* 77 NY2d 981 [1991]; *see Walker v Sheldon*, 10 NY2d 401 [1961]). Indeed, it has been observed that

> "[s]omething more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton" (Prosser and Keeton, Torts § 2, at 9-10 [5th ed 1984]; *see Prozeralik v Capital Cities Communications*, 82 NY2d 466, 479 [1993]).

As it must be the role of the court to provide oversight to ensure that punitive damages are not improperly or unwisely awarded, I would be remiss if I did not voice my objection to the imposition of such damages in this case, where the conduct at issue was motivated solely by concern for the plaintiff's health. In this case, the plaintiff sought punitive damages on the theory that the Center's procedures for preserving patient confidentiality were so flawed as to constitute a conscious or reckless disregard of her rights. However, the conceded negligence of the Center and its nurses does not rise to the level of conduct so reckless as to amount to a conscious disregard of the rights of others. The majority emphasizes that the Center and its nurses made more than a single mistake, that the nurses had differing understandings of the Center's confidentiality policy, and that the Center had no written policy. While the actions of the nursing staff reflect a lack of proper training, this is not a situation in which a health facility flagrantly disregarded the rights of its patients by having no policy in place to safeguard the confidentiality of medical information. Despite minor inconsistencies in the testimony of the Center's nurses regarding the precise pro-

cedure to be followed when a patient did not wish to be contacted at a particular phone number, all of the nurses were aware of the need to ensure patient confidentiality, and made good-faith efforts to comply with the Center's orally communicated procedure. Moreover, the various procedures which the nurses testified they followed, whether they consisted of crossing out a telephone number at which a patient did not wish to be contacted, or placing a "do not call" notation next to that number, would ordinarily be sufficient to alert fellow staff members that a particular number should not be used.

Although in hindsight it is easy to fault the Center for not placing the plaintiff's blood test results in her medical file as soon as they were received, the fact remains that the nurse who made the follow-up call to the plaintiff's home was unaware that the results had been received. Thus, by calling the plaintiff's home later that day, the nurse sought only to ensure her well-being. Furthermore, the majority's assertion that a rational jury could have found that the nurse disclosed to the plaintiff's mother that she had had an abortion is not supported by the record. Notably, nurse Kilroy testified that she would never mention the name of the surgical procedure the patient had undergone when leaving a message during a follow-up call. Moreover, an abortion is obviously not the only type of procedure which can result in vaginal bleeding, and in fact only a very small number of abortions were performed at the Center. Therefore, nurse Kilroy's disclosures were not tantamount to disclosing the abortion. In pointing this evidence out, I am by no means suggesting that punitive damages may only be awarded where acts of intentional wrongdoing have been committed. Indeed, as some of the cases cited by the majority demonstrate, there are certainly situations in which it is appropriate to award punitive damages for reckless conduct in the absence of malicious motive. However, it cannot be denied that the lack of a malicious motive is a highly relevant consideration when assessing whether a defendant's conduct warrants the imposition of a form of damages which exist solely to punish and deter wrongdoers.

The Court of Appeals' most recent discussion of the issue of punitive damages, set forth in *Ross v Louise Wise Servs., Inc.* (8 NY3d 478 [2007]), is instructive. In *Ross*, where the defendant's conduct was far more egregious than the negligence at issue in this case, and resulted in far more devastating consequences, the Court of Appeals nevertheless concluded that the plaintiffs

had no viable claim for punitive damages. As set forth in the majority opinion, in *Ross* the parents of an adoptive child sued an adoption agency for its intentional failure to disclose that the biological family of the baby boy they adopted had a history of severe mental illness. According to the court's decision, the plaintiffs contacted the agency in 1960 for assistance in adopting an infant, and expressed a preference for a healthy infant from a healthy family. When the plaintiffs were offered an infant for adoption in the spring of 1961, they were told that he was a demanding baby who liked attention, and that the biological parents were healthy. An agency social worker also disclosed that the birth father was allergic to penicillin, and that the maternal grandfather had died of heart disease. However, the plaintiffs were not told that the birth mother was emotionally disturbed, that her own father had been hospitalized for schizophrenia, and that the birth father had been described by a psychiatrist as a seriously disturbed young man suffering from paranoid schizophrenia. The plaintiffs agreed to adopt the baby boy, whom they named Anthony. During his childhood, Anthony exhibited severe behavioral problems, prompting the plaintiffs to seek psychiatric help for him. As Anthony grew older, his behavior became increasingly violent, and he was eventually diagnosed as a paranoid schizophrenic.

Prompted by a newspaper article published in 1999 about a couple who had adopted a child from the same agency without knowing that the biological family's history included schizophrenia, the plaintiffs sought and obtained Anthony's medical records that spring. Shortly after receiving the records, the plaintiffs commenced an action against the agency seeking compensatory and punitive damages, inter alia, for wrongful adoption. The agency thereafter moved for summary judgment, relying upon evidence that it was the practice of social workers and other professionals in the adoption field in the 1960s not to disclose information that could be viewed as negative and which was not believed to be hereditary for fear that such information would have an adverse impact on how the parents would nurture their adoptive child. This practice remained in effect until the Social Services Law was amended in 1983 to require that medical histories be disclosed to preadoptive parents.

Although the Court of Appeals prefaced its analysis by noting that it was troubled by the agency's intentional concealment of facts about Anthony's background, it concluded that the agency's conduct did not evince the high degree of moral

turpitude required for the imposition of punitive damages. Focusing on the agency's conduct at the time of the subject adoption, the court observed that there was nothing in the record to disprove that it was indeed the agency's policy in the 1960s not to disclose information about a history of mental illness in the child's background because many professionals believed at that time that mental illness could be avoided if a child were placed in a loving environment. The court then commented that "[w]hile it may be difficult for us in the twenty-first century to envisage not discussing mental or physical illness with prospective parents, and while such normative conduct may be deemed tortious even for that time, we cannot say that the record shows that the Agency's motivation was malicious or vindictive" (*Ross v Louise Wise Servs., Inc.*, 8 NY3d at 490). The court further observed that the imposition of punitive damages would not serve the purpose of deterrence because the Social Services Law now requires that prospective adoptive parents be provided with the medical histories of a child legally freed for adoption, including psychological information.

There are, of course, some distinctions between the case at bar and *Ross*, which include the fact that *Ross* involved deliberate rather than negligent conduct. Nevertheless, the court's conclusion that the intentional concealment involved in *Ross* did not evince the high degree of moral turpitude required for the imposition of punitive damages quite clearly underscores that in this state, such damages are to be reserved for cases of exceptional misconduct.

I am mindful that the negligent disclosure of medical information in this case caused a rift between the plaintiff and her parents, and that all residents of this state—men as well as women—have the right to expect that their medical records will be kept confidential. However, as the plaintiff herself acknowledges, where punitive damages are sought for negligent behavior, the conduct complained of must be "so reckless as to amount to a conscious disregard of the rights of others" (*Home Ins. Co. v American Home Prods. Corp.*, 75 NY2d at 201). In *Home Insurance*, one of the cases upon which the majority relies, a dispute arose over insurance coverage for a punitive damages award imposed upon the manufacturer of the drug aminophylline. Although the defendant manufacturer was aware that there were risks inherent in the administration of the drug to children in suppository form, it nevertheless failed to warn the medical profession of these risks. As a result of the

administration of the drug, a two-year-old boy in Illinois sustained "grave and permanent injuries," including severe impairment of mental function (*Home Ins. Co. v American Home Prods. Corp.*, 75 NY2d at 199). The parents of the Illinois child commenced a products liability action in that state against the defendant's subsidiary upon the theory that the drug was unreasonably dangerous due to the lack of adequate warnings. An Illinois jury awarded the parents punitive damages based upon its finding that the subsidiary was guilty of willful and wanton conduct, i.e., a course of conduct which shows deliberate intention to harm or an utter indifference or conscious disregard of the safety of others. In the context of an ensuing declaratory judgment action commenced to resolve the issue of whether the plaintiff insurance company was liable for the payment of punitive damages under the excess coverage policy it had issued to the defendant manufacturer, the Court of Appeals determined that the public policy of this State did not preclude an award of punitive damages in a strict products liability case where there was evidence that the failure to warn was wanton or in conscious disregard of the rights of others. The conduct which supported the imposition of punitive damages in the underlying products liability case—manufacturing a drug which was unreasonably dangerous because of the lack of adequate warnings—and the grave consequences which resulted from that improvident decision—are far removed from the conduct at issue in this case and its consequences. While it is certainly the public policy of this State to protect a medical patient's privacy, the negligent disclosure of patient information is not remotely comparable to placing an unreasonably dangerous drug on the market.

Indeed, the cases cited by the majority to demonstrate that punitive damages may be imposed for grossly negligent or reckless conduct amply demonstrate that punitive damages are appropriate only in cases involving conduct which is far more morally culpable than the conduct at bar. While the majority opinion refers to the Center's conduct as "reprehensible," it is wholly lacking in the element of blameworthiness present in the authority it relies upon.

For example, in *McWilliams v Catholic Diocese of Rochester* (145 AD2d 904 [1988]), the plaintiff alleged that his developmentally-disabled daughter was mistreated while she was a resident in a facility operated by the defendant. Among the plaintiff's allegations were that his daughter had been

overmedicated, physically abused, and segregated in an unheated basement. The Appellate Division, Fourth Department, found that these allegations were sufficient to allege either the gross negligence or the intentional, wanton, or malicious conduct necessary to support a claim for punitive damages. While the definition of reprehensible conduct may vary among individuals, in my view the mistreatment of a helpless individual constitutes cruelty, and has an element of moral culpability that is entirely lacking in this case.

Furthermore, in *Rinaldo v Mashayekhi* (185 AD2d 435 [1992]), where the Appellate Division, Third Department, upheld a jury's punitive damages award, there was evidence that the defendant was driving while intoxicated, on a heavily congested public street, when he plowed into the rear of the plaintiff's vehicle. There was also testimony that the defendant was driving at an excessive rate of speed, and that he took no action whatsoever to avoid the collision. Thus, *Rinaldo* provides an example of reckless conduct which jeopardizes public safety, which is completely dissimilar to the instant case.

In the case of *Figueroa v Flatbush Women's Servs.* (201 AD2d 613, 614 [1994]), this Court found that an issue of fact existed as to whether the defendant medical center had engaged in gross recklessness or wanton conduct where it appeared that it "may have performed abortions without any legal authority to do so, and in violation of various pertinent New York City and New York State regulations." However, licensing regulations are clearly aimed at public safety, and a facility which performs abortions without any legal authority to do so places the health and safety of patients at risk.

Health and safety concerns also underlie this Court's recent decision in *Colombini v Westchester County Healthcare Corp.* (24 AD3d 712 [2005]), where we found that it would be premature to dismiss a punitive damages claim asserted against a facility administering MRI tests. In that case, a six-year-old child was undergoing an MRI test when an anesthesiologist called for oxygen. A nurse handed the physician an oxygen tank made of ferrous metal, which was drawn into the magnet of the MRI machine, and struck the child in the head and face. The child subsequently died of his injuries. In finding that summary judgment would be premature, this Court noted that the plaintiffs had not had an adequate opportunity to conduct discovery into issues regarding the facility's safety procedures and training. Notably, the safety procedures at issue in *Colombini* were literally a matter of life and death.

Life and death was also at issue in *Guariglia v Price Chopper Operating Co., Inc.* (38 AD3d 1043 [2007]), where a pharmacist was criminally negligent in leaving narcotics unsecured and within easy reach of a two-year-old child, who died after ingesting the drugs, and in *Fordham-Coleman v National Fuel Gas Distrib. Corp.* (42 AD3d 106 [2007]), where a woman froze to death because the defendant failed to provide gas service to her new residence.

Although one of the cases cited by the majority, the Appellate Division, Fourth Department's decision in *Doe v Roe* (190 AD2d 463 [1993]), also involved a breach of confidentiality, I am not persuaded that the rationale in *Doe* supports the imposition of punitive damages here. In *Doe*, the plaintiff advised the defendant physician, who was treating him for ear and sinus problems, that he had tested positive for the human immunodeficiency virus (hereinafter the HIV virus). The plaintiff subsequently filed a workers' compensation claim in Pennsylvania, claiming that his ear and sinus problems were job-related injuries. An attorney representing the plaintiff's employer subsequently sent the defendant a subpoena directing her to appear at a workers' compensation hearing in Pennsylvania, and to bring with her all medical records and reports relating to the plaintiff's treatment. The attorney's transmittal letter advised the defendant, whose office was located in Syracuse, New York, that she would not have to appear at the hearing if she submitted the requested documents directly to the attorney. In response to the subpoena, the defendant sent the attorney the plaintiff's entire medical chart, which included a reference to the fact that the plaintiff was HIV-positive. The plaintiff thereafter commenced an action seeking compensatory and punitive damages on the theory that the defendant had violated her common-law and statutory duties to preserve the confidentiality of his HIV status by disclosing that status to his employer. The physician moved, inter alia, for summary judgment dismissing the request for punitive damages, and the Supreme Court granted that branch of his motion. In reinstating the punitive damages claim, the Appellate Division, Fourth Department, noted that the defendant had not sustained her burden of demonstrating her entitlement to judgment as a matter of law on this issue because she had submitted no evidence "suggesting a good-faith basis for her improper disclosure of HIV-related information" (*Doe v Roe*, 190 AD2d at 476). In this regard, the court observed that "[t]he subpoena directed defendant to ap-

pear in Pennsylvania for a hearing and to bring plaintiff's medical records with her. Defendant did not appear at the hearing. Instead, she disclosed confidential HIV-related information to the attorney representing plaintiff's employer" (*id.*). The court also noted that disclosure of a patient's HIV status pursuant to a subpoena was prohibited by Health Department regulations, and that an inference could be drawn that the defendant "forwarded the confidential information to the employer's attorney to avoid the inconvenience of appearing at the hearing in Pennsylvania" (*id.*).

Notably, the Appellate Division, Fourth Department's decision to allow the punitive damages claim to stand in *Doe* was based upon the defendant's failure to prove a good-faith basis for her improper disclosure, and the inference that she had acted for her own convenience. In contrast, here the evidence adduced at the damages trial demonstrates that the Center's nurses acted in good faith to ensure that the plaintiff was not experiencing complications from the abortion, and that she had called her doctor's office to obtain her full blood test results. Moreover, two of the Center's nurses did ask the plaintiff about which number should be called to contact her. Although errors were admittedly made by pasting over the plaintiff's cell phone number on the preoperative questionnaire and failing to indicate on the follow-up form that she was not to be called at her home number, no inference can be drawn that the nurses acted in bad faith, or placed convenience above the need to protect the plaintiff's confidentiality.

Although the majority also reasons that evidence as to whether there had been any prior breaches of patient confidentiality is relevant to the issue of whether the Center consciously disregarded the plaintiff's rights, I note that the plaintiff made no attempt to introduce such evidence. Indeed, it would not be unreasonable to assume that no such evidence exists, since the Center attempted to introduce evidence that no similar breaches had occurred in the past, but was not permitted to do so. In any event, in the absence of evidence of prior breaches of patient confidentiality, the plaintiff's case remains an isolated incident.

Finally, the imposition of punitive damages in this case is completely unnecessary to deter similar conduct in the future. The record reveals that the New York State Department of Health, Office of Health Systems Management (hereinafter the Department of Health) conducted an investigation into the Center's breach of confidentiality in this case. Based upon its

investigation, the Department of Health issued a "Statement of Deficiencies," and required the Center to formulate a plan to correct each specified deficiency. The Center thereafter complied with the Department of Health's directive by devising a plan to correct the deficiencies which had resulted in the breach of confidentiality. Thus, corrective action has already been taken by the Center to prevent future breaches of patient confidentiality. Moreover, I do not believe that the imposition of punitive damages is necessary to deter breaches by other medical facilities, which are similarly subject to regulation and oversight by the Department of Health.

In sum, this case calls upon us to make a threshold determination as to whether the conduct of the Center was so culpable as to warrant the imposition of punitive damages to express societal disapproval. In my view, the Center's negligence did not rise to this level, and thus the plaintiff's claim for punitive damages should have been dismissed.

McCarthy and Dickerson, JJ., concur with Fisher, J.; Krausman, J., and Crane, J.P., concur in part and dissent in part and vote to modify the judgment appealed from by deleting the provision thereof awarding punitive damages, and, as so modified, to affirm the judgment in a separate opinion by Krausman, J.

Ordered that the judgment is modified, on the law, by deleting the provision thereof awarding punitive damages in the sum of $300,000; as so modified, the judgment is affirmed, with costs to the defendant, so much of the order dated March 29, 2005, as denied those branches of the defendant's motion which were to set aside the jury verdict on the issue of punitive damages and for a new trial on those damages is vacated, those branches of the defendant's motion which were to set aside the jury verdict on the issue of punitive damages and for a new trial on those damages are granted, the claim for punitive damages is severed, and the matter is remitted to the Supreme Court, Suffolk County, for a new trial on the issue of punitive damages and the entry of an appropriate judgment thereafter.