[868 NE2d 189, 836 NYS2d 509]

ARTHUR ROSS et al., Respondents-Appellants, v LOUISE WISE SERVICES, INC., Appellant-Respondent.

Argued March 27, 2007; decided May 3, 2007

### POINTS OF COUNSEL

*Sedgwick, Detert, Moran & Arnold LLP,* New York City (*David M. Covey* and *Caryn M. Silverman* of counsel), for appellant-respondent. I. Wrongful adoption claims against social service agencies, such as Louise Wise Services, Inc., do not warrant punitive damages as a matter of law; the decisions in *Juman v Louise Wise Servs.* (3 AD3d 309 [2004]) and *Jeffrey BB. v Cardinal McCloskey School & Home for Children* (257 AD2d 21 [1999]), factually indistinguishable from this case, are dispositive. (*Rocanova v Equitable Life Assur. Socy. of U.S.,* 83 NY2d 603; *Walker v Sheldon,* 10 NY2d 401.) II. This Court has held repeatedly that punitive damages may be available as a matter of law only in limited circumstances; therefore, the First Department erred as a matter of law in holding that the record supports a claim for punitive damages. (*Walker v Sheldon,* 10 NY2d 401; *Rocanova v Equitable Life Assur. Socy. of U.S.,* 83 NY2d 603; *Home Ins. Co. v American Home Prods. Corp.,* 75 NY2d 196; *164 Mulberry St. Corp. v Columbia Univ.,* 4 AD3d 49; *Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577; *Matter of Rudin Mgt. Co. v Commissioner of Dept. of Consumer Affairs of City of N.Y.,* 213 AD2d 185; *Matter of Kennedy v Kennedy,* 251 AD2d 407, 92 NY2d 818; *Matter of Hays v Ward,* 179 AD2d 427, 80 NY2d 754.) III. The First Department erred in holding that punitive damages are potentially available where no showing has been made that such damages are necessary, under the circumstances, to deter future or similar conduct. (*Hartford Acc. & Indem. Co. v Village of Hempstead,* 48 NY2d 218; *Walker v Sheldon,* 10 NY2d 401; *Zurich Ins. Co. v Shearson Lehman Hutton,* 84 NY2d 309.) IV. Punitive damages may not be utilized as a means of addressing a perceived inequity in the compensatory damages potentially recoverable. (*Zurich Ins. Co. v Shearson Lehman Hutton,* 84 NY2d 309; *Home Ins. Co. v American Home Prods. Corp.,* 75 NY2d 196; *Jeffrey BB. v Cardinal McCloskey School & Home for Children,* 257 AD2d 21; *Juman v Louise Wise Servs.,* 3 AD3d 309.) V. A trial of the punitive damages claim will result in a waste of judicial and party resources.

*Phillips Nizer, LLP,* New York City (*Michael J. Silverberg* and *Bruce Turkle* of counsel), for respondents-appellants. I. Sum-

mary judgment must be denied where triable issues are shown to exist. (*Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395; *Matter of Warder v Board of Regents of Univ. of State of N.Y.,* 53 NY2d 186; *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369; *Millerton Agway Coop. v Briarcliff Farms,* 17 NY2d 57; *Andre v Pomeroy,* 35 NY2d 361; *Moskowitz v Garlock,* 23 AD2d 943; *Ferrante v American Lung Assn.,* 90 NY2d 623; *Giuffrida v Citibank Corp.,* 100 NY2d 72; *Lesocovich v 180 Madison Ave. Corp.,* 81 NY2d 982; *Greenberg v Bar Steel Constr. Corp.,* 22 NY2d 210.) II. Plaintiffs' second and third causes of action were improperly dismissed. (*General Stencils v Chiappa,* 18 NY2d 125; *Farkas v Farkas,* 168 F3d 638; *Glus v Brooklyn Eastern Dist. Terminal,* 359 US 231; *Erbe v Lincoln Rochester Trust Co.,* 13 AD2d 211; *Meridien Intl. Bank v Government of Republic of Liberia,* 23 F Supp 2d 439; *Smith v Cutson,* 188 AD2d 1034; *Mandelblatt v Devon Stores,* 132 AD2d 162; *Insurance Co. of N. Am. v Whitlock,* 216 App Div 78; *Juman v Louise Wise Servs.,* 254 AD2d 72; *Junius Constr. Corp. v Cohen,* 257 NY 393.) III. The trial court properly refused to summarily dismiss plaintiffs' claim for punitive damages. (*Walker v Sheldon,* 10 NY2d 401; *Giblin v Murphy,* 73 NY2d 769; *Borkowski v Borkowski,* 39 NY2d 982; *Welch v Mr. Christmas,* 57 NY2d 143; *Nardelli v Stamberg,* 44 NY2d 500; *Laurie Marie M. v Jeffrey T.M.,* 159 AD2d 52, 77 NY2d 981; *Roy v Hartogs,* 81 Misc 2d 350; *Micari v Mann,* 126 Misc 2d 422; *Juman v Louise Wise Servs.,* 3 AD3d 309; *Jeffrey BB. v Cardinal McCloskey School & Home for Children,* 257 AD2d 21.)

**OPINION OF THE COURT**

Chief Judge KAYE.

Plaintiffs, adoptive parents Arthur Ross and Barbara Ross, have asserted three causes of action against Louise Wise Services: wrongful adoption/fraud; negligence and breach of fiduciary duty; and intentional infliction of emotional distress. On defendants' motion for summary judgment, we conclude that, while plaintiffs may seek compensatory damages, punitive damages are not available for the first claim in this case, and statutes of limitations bar the second and third claims.

## Facts

In 1960 plaintiffs applied to Louise Wise (the Agency) for assistance in adopting an infant.[1] They told the Agency that they preferred a "healthy infant from a healthy family," and that "it would be nice if the baby's birth family had an artistic background." Mr. Ross was nationally recognized in the advertising field, had won awards and made a good salary, and the couple were engaged in various cultural activities. According to one social worker who had interviewed them, plaintiffs were mature, seemed comfortable about adopting a child and could handle the situation "better than the average couple with whom we place a child."

In the spring of 1961 plaintiffs were offered a boy, born January 11, 1961. In response to plaintiffs' question about the health of the baby and his biological family, the social worker told plaintiffs this was "a demanding baby who likes attention." She described the physical appearance and artistic interests of the birth parents and indicated that they were healthy but the birth father was allergic to penicillin and the maternal grandfather had died of heart disease. The Agency did not, however, disclose that either of the birth parents or members of their families had suffered from emotional disturbance.

According to Agency files, the biological mother never had a "normal" home life. In 1952, her father, the baby's biological grandfather, was hospitalized for 1½ years for schizophrenia when he was in his mid-60s. The report also indicated that the birth mother was worried that her feelings of stress could affect the baby. She and the biological father married only because she was pregnant. She had seen a psychiatrist, who wrote to the Agency that the mother "presented as a girl who was failing in her major adjustments to life: late to school with the result that she failed to maintain matriculation at two colleges; few friends; hostility to most people; and demanding dependency." The biological father, according to the files, saw a psychiatrist, who, after one meeting, stated that the father was "a seriously disturbed young man, classified him as a paranoid, schizophrenic, and felt he had married purely for her [the birth

---

1. Founded in 1916, the Agency sought good homes for children placed for adoption. By the late 1990s, it no longer acted as an adoption agency, and instead offered training and support for foster care families and children. Those operations ceased in 2004, and the Agency's records were placed with a different adoption agency. Currently, the Agency has social services programs but runs neither adoption nor foster care placements.

mother's] money." The doctor also noted that, while the birth father could use treatment, "there was no rush."

Plaintiffs accepted the child, and on March 30, 1961, took home the baby they named Anthony. Although he was an active, difficult infant who could not sleep well, Ms. Ross attended to him and he was a happy baby. The adoption was finalized in 1962, and in 1964 plaintiffs adopted a daughter from the Agency. By the time Anthony was four, his troublesome behavior led plaintiffs to seek professional help.

Postadoption Events

In 1970, when Anthony was nine years old and the difficulties increased, plaintiffs called the Agency and were directed to Barbara Miller, head of the Post-Adoption Service. Plaintiffs told Miller that Anthony was experiencing "night terrors," cursed at the family, hit his parents and threatened people with objects. Ms. Ross suspected that he was hyperactive and might have brain dysfunction. Plaintiffs asked whether there could have been problems with the birth mother, whether she had taken drugs, whether she attempted to abort the pregnancy or whether there was birth trauma. Miller recommended that plaintiffs see a psychiatrist, Dr. Anne-Marie Weil, associated with the Agency. Miller's letter to Weil noted that Anthony's birth mother and grandfather "had histories of emotional instability"; however, Miller did not give Weil any specifics of the schizophrenia, and neither Miller nor Weil told plaintiffs of any emotional instability. Weil never saw Anthony himself, and her suggestions for behavior modification were to no avail.

While Ms. Ross wished to get treatment for Anthony, Mr. Ross disagreed and hoped that Anthony would grow out of his disruptive behavior. In 1973, after Anthony's school advised plaintiffs that Anthony needed a special school, they called Miller again to ask that she send a summary of Anthony's "birth history, background and foster home experience to Dr. Stella Chess," a well-known child psychiatrist plaintiffs had engaged. Although Miller mentioned in her report to Chess that Anthony was a tense, active baby, she did not tell the doctor of the birth parents' history of schizophrenia. In the same call to Miller, Ms. Ross indicated that she suspected more and more that Anthony's difficulties were organically based and divulged that she was forced to separate herself from her son as much as possible since his violence was getting progressively worse.

When she phoned the Agency in 1981, Ms. Ross told Miller that, fearful of her own and her daughter's physical well-being,

she had moved out of her home in 1978 when Anthony had finished a special high school. Plaintiffs divorced in 1979. The daughter then lived with her mother and Anthony with his father. Though Miller stated in her notes that Anthony remained disturbed and undiagnosed, she mentioned nothing to plaintiffs about his biological background.[2]

Anthony continued to live with his father and graduated from college. Over the years, he did see several doctors, none of whom could assist him. He had some odd jobs but could not keep any. Ms. Ross called the Agency in 1994 and told them that she thought Anthony had ADHD. The Agency again did not disclose any information, including that it had received a call in 1984 that Anthony's birth mother had committed suicide in 1973. Anthony's behavior became more erratic, and he started to see a psychiatrist again. In 1995, when Anthony was 34, Mr. Ross woke up to find his son about to hit him with a large flashlight. Anthony was taken to Bellevue, where he was diagnosed as a paranoid schizophrenic.

The Action

The New York Times Magazine on March 14, 1999, published an article, *What the Jumans Didn't Know About Michael*, describing a family who adopted a boy from the Agency and learned years later that the birth family's history included schizophrenia. As a result, plaintiffs sought Anthony's medical records. These were sent in April 1999, and plaintiffs filed suit on June 25, 1999. Plaintiffs testified in their depositions that much as they love Anthony, they would not have adopted him before they saw him if they had been told about the schizophrenia in his biological family, and that psychiatrists might have treated him differently had disclosure been made earlier. Further, they claimed that the stresses in their family resulted in both plaintiffs' clinical depression, the dissolution of their marriage and lost employment.

---

2. In June 1982, Anthony, 21, unexpectedly appeared at Dr. Weil's office and asked for a report that she had written 10 years earlier. Weil had no recollection of the report but called Miller, who wrote in her notes that the doctor was frightened by Anthony's demeanor and felt he was a paranoid schizophrenic, capable of violence. Miller wrote back saying that she appreciated the caution, but neither Miller nor Weil alerted the plaintiffs. In 1984, when Anthony was 23, he made an appointment at the Agency to learn about his birth history. He was told what plaintiffs had been told at the outset—that the medical information was good.

Agency Policies in the 1960s and 1970s

In the 1960s and 1970s, the belief among the social workers and psychiatrists who worked for the Agency was that, in the development of a child, nurture played a far more significant role than nature. For that reason, the policy of the Agency was not to disclose certain information about a birth family's medical history if the doctors were unsure whether the factors were hereditary. Anita Longo Sorensen, the Agency's expert witness, expressed this opinion in an affidavit and added:

> "Moreover, it was the belief and general opinion of social workers and other professionals in the adoption field at those times that mental illness would not be passed on if a child were placed in a loving environment.

> "It was also the general opinion and belief of social workers and other professionals in the adoption field at those times that the disclosure of certain information to prospective adoptive parents would interfere with the bonding between adoptive parent and child and prove detrimental to the child, the parents and their relationship. Therefore, it was the practice of social workers and other professionals in the adoption field in the 1960s and into the early 1980s not to disclose information that could be viewed as negative and which was not believed to be hereditary for fear that it would influence the family adversely on how they would nurture the adopted child. This practice remained in effect until changes were made in the Social Services Law and the Public Health Law in the early-mid 1980s."

Specifically, psychiatrists were unsure about the hereditary factors of mental illness and therefore would not discuss with adoptive parents mental disturbances of the biological family. Florence Kreech, Executive Director of the Agency during that period, testified that their psychiatrists "felt for many, many years we knew so little about schizophrenia and they felt very strongly about not putting labels on people." Kreech knew that studies were underway, but the Agency's psychiatrists "knew too little about hereditary factors," and had no certain information that a child of a parent or parents who had schizophrenia had a greater risk of developing it. "[T]here were children that may have come from parents—and, again, they wouldn't put labels on them—whose parents were disturbed, but it did not necessarily follow that the children were going to be disturbed."

Miller conceded that she concealed the biological information from all adoptive parents, including plaintiffs, when they called with postadoptive questions. She followed what the Agency considered normative policy. Generally, the Agency might have told a couple that there was some disturbance in the family background, but more likely the Agency, without divulging aberrant history, would find an adoptive couple who could be accepting of emotional problems. Social workers and psychiatrists were concerned that the child not be stigmatized.

> "[I]f there were a history of mental illness which we understood to be noninheritable at that time—and I couldn't find a psychiatrist in New York at the time who would have told you that it was inherited—we would not mention that, simply because our psychiatrist felt that it had no meaning and it would only cause anxiety or might cause anxiety in the parents."

A "healthy baby" at that time meant a physically healthy child.

The Agency has included in the record extracts from literature published in the 1960s through 1980s to underscore the divergent views on the etiology of schizophrenia. For example, Herbert Weiner, M.D., wrote in 1967 that "In psychiatry, the nature-nurture controversy continues to rage . . . ." (*Schizophrenia III: Etiology*, in Freedman and Kaplan, Comprehensive Textbook of Psychiatry § 15.3, at 604 [1967].) The author concluded that "The environment may continuously interact with the genotype to elicit certain kinds of general potentialities and more specific dispositions to react to certain categories of environmental stress that lead to the illness" (*id.* at 620).

Plaintiffs too presented the affidavit of an expert, Dr. Dolores Malaspina, whose work concentrates on schizophrenia. She indicated that as far back as 1911 a study showed that schizophrenia "arose from a hereditary taint," and even in the 1920s, studies demonstrated elevated risks for the disease in close relatives. Malaspina affirmed that "[a]lthough a number of American practitioners theorized in the post-World War II era that schizophrenia could arise from a dysfunctional family, the evidence of its genetic familial nature was never questioned." Studies indicated that the likelihood of getting schizophrenia for someone with one affected parent is 12%, and the risk for bilineal inheritance is 46%. A doctor's not knowing the family history could make diagnosis "correspondingly difficult."

It was not until 1983 that the Legislature enacted Social Services Law § 373-a (L 1983, ch 326, amended by L 1985, chs 103, 142), which provides that medical histories should be disclosed to preadoptive parents and adult adoptees. In 1985, the statute was amended to include adoptive parents. The Legislature also enacted Public Health Law §§ 4138-b, 4138-c and 4138-d, effective December 6, 1983, establishing an Adoption Information Registry in the Department of Health to allow adult adoptees to obtain nonidentifying medical information.

Decisions of the Lower Courts

In Supreme Court, the Agency moved for an order granting summary judgment dismissing plaintiffs' complaint; granting partial summary judgment dismissing plaintiffs' second and third causes of action as time-barred; dismissing plaintiffs' claim for emotional distress and recovery of business or other losses from that emotional distress, and limiting potential recovery of compensatory damages to extraordinary out-of-pocket expenses of raising plaintiffs' adopted child to age 21; and dismissing plaintiffs' claim for punitive damages. Refusing to grant summary judgment as to the first count (wrongful adoption/fraud), the court found triable issues of fact as to whether the Agency concealed or misrepresented material facts at the time of the adoption and in subsequent years about the child's biological history. The court dismissed the claims for negligence and intentional infliction of emotional harm on statute of limitations grounds, limited potential recovery of compensatory damages to out-of-pocket expenses before the child reached 21 and allowed the claim for punitive damages to proceed.

The Appellate Division affirmed. The Agency did not appeal Supreme Court's refusal to dismiss the cause of action for wrongful adoption. All five Appellate Division Justices agreed that the statute of limitations had run on the negligence and intentional infliction of emotional distress claims. As to the punitive damages, two Justices determined that plaintiffs had raised sufficient issues of fact based on the Agency's initial as well as subsequent failures to disclose the child's family history of mental illness. The two other Justices in the majority concluded that the issue concerned the conduct surrounding the adoption and consequences of the initial concealment, not the Agency's subsequent action or inaction. The dissent, while not questioning plaintiffs' cognizable claim of wrongful adoption, stated that punitive damages could rest only on conduct at the time of the adoption and on the Agency's motivation—which,

from the extensive record evidence, was not to hurt maliciously or inflict pain but to find a good home for the child. The Appellate Division granted leave.

The Agency appeals from the order allowing the issue of punitive damages to proceed; plaintiffs cross-appeal from the order dismissing their second and third causes of action. We agree with the trial court and Appellate Division on the statute of limitations issue, agree with the dissent on the punitive damages issue and accordingly modify the order of the Appellate Division.

## Analysis

■ As a threshold matter, the Agency, in failing to challenge the order leaving in place the action for wrongful adoption, acknowledges that plaintiffs have raised a cognizable claim under common-law fraud principles in the adoption setting (*see Juman v Louise Wise Servs.*, 159 Misc 2d 314, 316-317 [NY County 1994], *affd* 211 AD2d 446 [1st Dept 1995]).[3] The court in *Juman* indicated that the tort concerned not simply an agency's silence but " 'the deliberate act of misinforming' " a couple who were deprived of their right to make informed parenting decisions (*id.* at 318 [citation omitted]). To establish a prima facie case for fraud, plaintiffs would have to prove that

> "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant[ ] intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss" (*id.* at 320).

Thus, plaintiffs here will have the opportunity to show that the Agency's admitted policy to withhold information from them concerned material facts on which they relied and as a result of which they sustained monetary losses.

The questions we are called upon to answer are whether plaintiffs may seek punitive damages for wrongful adoption/ fraud as alleged, and whether equitable estoppel bars the Agency from asserting the defense of statute of limitations on the second and third causes of action.

---

**3.** The *Juman* case was remanded to Supreme Court, which issued an opinion (174 Misc 2d 49 [NY County 1997], *mod* 254 AD2d 72 [1st Dept 1998]). On the questions of pecuniary and punitive damages, the case was again remanded (*Juman v Louise Wise Servs.*, Sup Ct, NY County, Sept. 1, 2000, Lehner, J., Index No. 005809/92, *mod* 3 AD3d 309 [1st Dept 2004]).

Punitive Damages

Compensatory damages are intended to have the wrongdoer make the victim whole—to assure that the victim receive fair and just compensation commensurate with the injury sustained. Punitive damages are not to compensate the injured party but rather to punish the tortfeasor and to deter this wrongdoer and others similarly situated from indulging in the same conduct in the future (*Walker v Sheldon*, 10 NY2d 401, 404 [1961]; *see Krohn v New York City Police Dept.*, 2 NY3d 329, 335 [2004]; *Sharapata v Town of Islip*, 56 NY2d 332, 335 [1982]). Subjecting a wrongdoer to punitive damages serves to deter future reprehensible conduct. Hence the term "exemplary damages" is a synonym for punitive damages.

Punitive damages are permitted when the defendant's wrongdoing is not simply intentional but "evince[s] a high degree of moral turpitude and demonstrate[s] such wanton dishonesty as to imply a criminal indifference to civil obligations" (*Walker*, 10 NY2d at 405; *see Rocanova v Equitable Life Assur. Socy. of U.S.*, 83 NY2d 603, 613 [1994]). In *Prozeralik v Capital Cities Communications* (82 NY2d 466, 479 [1993]), the Court wrote that punitive damages may be sought when the wrongdoing was deliberate " 'and has the character of outrage frequently associated with crime' " (citation omitted). The misconduct must be exceptional, "as when the wrongdoer has acted maliciously, wantonly, or with a recklessness that betokens an improper motive or vindictiveness . . . or has engaged in outrageous or oppressive intentional misconduct or with reckless or wanton disregard of safety or rights" (*Sharapata*, 56 NY2d at 335 [citations and internal quotation marks omitted]; *see also Wilson v City of New York*, 7 AD3d 266, 267 [1st Dept 2004] [misconduct lacked "the character of spite, malice or evil motive"]).

Plaintiffs in *Juman* brought suit for wrongful adoption on facts analogous to those here. The prospective adoptive parents had been told certain information about the birth parents but not that they had met in a psychiatric hospital and that the mother had undergone a frontal lobotomy years before the child was born. The child became paranoid schizophrenic. The First Department found that the plaintiffs were entitled to seek compensatory damages but not punitive damages—conduct subsequent to the enactment of Social Services Law § 373-a setting standards for disclosure was irrelevant to the wrongful adoption claim "since the operative facts are those that oc-

curred at and around the time of the . . . adoption" (3 AD3d at 310).

In *Jeffrey BB. v Cardinal McCloskey School & Home for Children* (257 AD2d 21 [3d Dept 1999]), also a wrongful adoption case, the Third Department similarly dismissed a claim for punitive damages. Although the prospective parents, who had five other children, specifically asked about problems in the child's background, the agency withheld that she had been sexually abused. She would, thereafter, allegedly abuse two of the other children. The court determined that the agency's actions did not rise to the level of culpable conduct necessary to award exemplary damages.

In this case, the Agency has conceded that it intentionally misrepresented facts about Anthony's background. We are troubled by such concealment, and sympathetic to the suffering plaintiffs have endured. They have presented sufficient triable facts to proceed on their fraud claim for compensatory damages.

In its motion for summary judgment, however, the Agency has shown that, even if its failure to disclose may have been tortious, its conduct in connection with the adoption did not evince the high degree of moral turpitude required for punitive damages. Nor would punitive damages be warranted against the Agency for deterrence.

First, nothing in the record disproves what the Agency's own social workers and its expert stated—in the 1960s and even into the early 1980s the policy was not to disclose certain information about the child's biological background if the professionals were unsure whether the factors were hereditary. Many thought that mental illness could be avoided if a child were placed in a loving environment and that disclosure of birth parents' emotional disturbances would negatively affect the child's bonding with the adoptive parents. While it may be difficult for us in the twenty-first century to envisage not discussing mental or physical illness with prospective parents, and while such normative conduct may be deemed tortious even for that time, we cannot say that the record shows that the Agency's motivation was malicious or vindictive.

Not until 1983 did the Legislature enact Social Services Law § 373-a to require disclosure of medical histories to prospective adoptive parents and adult adoptees. Although we address common-law tort and not violation of the statute, that the statute was enacted only in the 1980s is a factor in determining that punitive damages are inappropriate here.

As to deterrence, section 373-a now requires agencies to provide to prospective adoptive parents and, upon request, to adoptive parents "the medical histories of a child legally freed for adoption . . . and of his or her natural parents, with information identifying such natural parents eliminated." Medical histories include "psychological information" (*id.*). Thus, the statute assures that agencies do not conceal relevant history of birth parents. Moreover, defendant Agency no longer acts in placing children for adoption, and its records are now housed at a different agency.

The complaint here includes a single cause of action for wrongful adoption and fraud at the time of the adoption. There are no separate counts of fraud concerning conduct in later years. Thus, even though no justification may exist, for example, for the Agency's failure to disclose information to the doctors plaintiffs consulted for Anthony in the 1970s, the fraud of wrongful adoption must center on the conduct that induced the prospective parents to accept the child. Because we cannot conclude from the record that the initial concealment was motivated by malice so as to warrant punitive damages, or that these damages would deter future reprehensible conduct, we limit plaintiffs' potential recovery to compensatory damages.

Equitable Estoppel

█ The second and third causes of action—for negligence and infliction of emotional distress—are barred by the statutes of limitations under CPLR 214 (three years) and CPLR 215 (one year) respectively. Plaintiffs do not assert that the discovery rule under CPLR 203 (g) that permits the fraud claim to proceed is applicable to these torts, for plainly it is not. Rather, they argue that the doctrine of equitable estoppel should apply.

Under this doctrine, a defendant is estopped from pleading a statute of limitations defense if the "plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action" (*Simcuski v Saeli*, 44 NY2d 442, 449 [1978]). For the doctrine to apply, a plaintiff may not rely on the same act that forms the basis for the claim—the later fraudulent misrepresentation must be for the purpose of concealing the former tort (*see Zumpano v Quinn*, 6 NY3d 666, 674 [2006]; *Rizk v Cohen*, 73 NY2d 98, 105-106 [1989]). The uncommon remedy of equitable estoppel "is triggered by some conduct on the part of the defendant after the initial wrongdoing; mere silence or failure to disclose the wrongdoing is insufficient" (*Zoe G. v Freder-*

*ick F.G.*, 208 AD2d 675, 675-676 [2d Dept 1994]). In *Zumpano* (6 NY3d at 674, 675), plaintiff brought suit against a priest and the Catholic Diocese years after he was allegedly sexually abused. We held that the defendants' failure to disclose the abuse was not a subsequent or specific action that kept the plaintiff from timely bringing suit, and thus did not constitute a basis for equitable estoppel.

Plaintiffs argue that the Agency's fraudulent conduct induced them not to file suit. They cite to *General Stencils v Chiappa* (18 NY2d 125 [1966]), in which plaintiff company sued its book-keeper for theft over many years. The Court held that the de-fendant could not assert a statute of limitations defense because she affirmatively and carefully concealed her crime and "produced the long delay between the accrual of the cause of ac-tion and the institution of the legal proceeding" (*id.* at 128). In this case, unlike *General Stencils*, nothing in the record indicates that the Agency attempted after the adoption to conceal medical histories to induce plaintiffs to forbear from fil-ing suit alleging negligence or infliction of emotional distress. Plaintiffs did not get in touch with the Agency until 1970, by which time both torts of negligence and infliction of emotional distress were already time-barred. Therefore, even if the Agency made fraudulent misrepresentations, plaintiffs had not been induced to refrain from filing suit, and equitable estoppel is not warranted in this case.

Accordingly, the order of the Appellate Division should be modified, without costs, by granting defendant's motion to dismiss plaintiffs' demand for punitive damages and, as so mod-ified, affirmed. The certified question should be answered in the negative.

Judges CIPARICK, GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

Order modified, etc.