Gomez v Cabatic (2018 NY Slip Op 00278)





Gomez v Cabatic


2018 NY Slip Op 00278


Decided on January 17, 2018


Appellate Division, Second Department


Leventhal, J.P., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 17, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

JOHN M. LEVENTHAL, J.P.
L. PRISCILLA HALL
LEONARD B. AUSTIN
SANDRA L. SGROI, JJ.


2014-05775
 (Index No. 12872/11)

[*1]Napoleon Gomez, etc., respondent-appellant,
v
Thelma O. Cabatic, etc., et al., defendants, Arlene B. Mercado, also known as Dr. Arlene Basa Mercado, appellant-respondent.



APPEAL by the defendant Arlene B. Mercado, also known as Dr. Arlene Basa Mercado, in a consolidated action to recover damages for wrongful death, etc., as limited by her notice of appeal and brief, from so much of an order of the Supreme Court, entered in Queens County on April 7, 2014 (Darrell L. Gavrin, J.), as denied those branches of her motion, in effect, pursuant to CPLR 4404(a) which were to set aside a jury verdict on the issue of punitive damages and for judgment as a matter of law dismissing the demand for punitive damages, or, in the alternative, to set aside the jury verdict on the issue of punitive damages as contrary to the weight of the evidence or in the interest of justice, and for a new trial on the issue of punitive damages, and granted that branch of her motion which was to set aside the jury verdict on the issue of punitive damages as excessive only to the extent of ordering a new trial on the issue of punitive damages unless the plaintiff stipulated to a reduction of the punitive damages award from the principal sum of $7,500,000 to the principal sum of $1,200,000, and CROSS APPEAL by the plaintiff, as limited by his brief, from so much of the same order as, in effect, granted that branch of that defendant's motion which was to set aside the jury verdict on the issue of punitive damages as excessive to the extent of ordering a new trial on the issue of punitive damages unless he stipulated to a reduction of the punitive damages award from the principal sum of $7,500,000, to the principal sum of $1,200,000.



Martin Clearwater & Bell LLP, New York, NY (Barbara D. Goldberg and Sean F. X. Dugan of counsel), for appellant-respondent.
Paul A. Hayt, New York, NY (Brian Isaac of counsel), for respondent-appellant.
Kern Augustine Conroy & Schoppmann, P.C., Westbury, NY (Michael A. Schoppmann and Donald R. May of counsel), for amicus curiae Medical Society of the State of New York.



LEVENTHAL, J.P.


OPINION & ORDER
The main question before us is whether a plaintiff may recover punitive damages for a medical professional's act of altering or destroying medical records in an effort to evade potential medical malpractice liability. We answer this question in the affirmative.
Background
This action arises from the death of a six-year-old child, Claudialee Gomez Nicanor, who developed diabetic ketoacidosis after the defendant Arlene B. Mercado failed to diagnose the [*2]child's type I diabetes. According to the evidence presented at trial, the child, who was born in December 2003, received her early pediatric care at two different hospitals. On October 26, 2009, when Claudialee was five, the defendant Thelma O. Cabatic became the child's pediatrician. A few days later, Cabatic recommended that Claudialee see a pediatric endocrinologist because the child's blood sugar level was high. The child's mother asked Cabatic for the name of an endocrinologist, and Cabatic referred her to Mercado. Mercado saw Claudialee three times, October 31, 2009, November 14, 2009, and December 12, 2009. Meanwhile, Cabatic again saw Claudialee in late November 2009, and on January 9, 2010.
On January 21, 2010, Claudialee returned home from school complaining that she was tired and did not feel well, and brought with her a note from the school nurse describing her symptoms. The child vomited that evening and said that she had a stomach ache. The next day, after having tried, unsuccessfully, to have Claudialee seen by Cabatic, the child's mother took Claudialee to a hospital. Claudialee remained hospitalized until her death on January 24, 2010. According to the final autopsy report, the child's death was "attributable to bilateral cerebellar tonsilar herniation secondary to cerebral edema following diabetic ketoacidosis."
Claudialee's father, Napoleon Gomez, as administrator of the child's estate (hereinafter the plaintiff), subsequently commenced separate actions against Cabatic and Mercado seeking to recover damages for medical malpractice and wrongful death. The two actions were thereafter consolidated.
As relevant to the issues raised on appeal, at her examination before trial, Mercado gave testimony indicating that she prepared and signed a typewritten report memorializing Claudialee's first visit on October 31, 2009, the same day that visit occurred. Specifically, Mercado was asked and answered:
"Q. When was the first time you saw her?
"A. 10/31/09.
"Q. That appears on page four of Plaintiff's Exhibit B. Is that correct?
"A. Yes.
"Q. Your examination—or you issued a report in connection with this examination. Is that right?
"A. Yes.
"Q. And is this a two-page report that you issued that day or you issued in connection with seeing the patient that day?
"A. Yes.
"Q. And did you sign that document?
"A. I did.
"Q. What date did you sign the document on?
"A. The date where I had—you know, the 10/31/09.
"Q. Were you involved in typing this report?
"A. Yes."
The typewritten record for the child's final visit with Mercado on December 12, 2009, stated, "[n]ext visit to record random BG's fasting and 2 hour post meal. TCB in 4 weeks." During her examination before trial, Mercado was shown an appointment card indicating that the child was not scheduled to return for an appointment with her until February 13, 2010, about two months later. [*3]Mercado said that her nephews were responsible for scheduling patient appointments and that she was not involved in selecting the February 2010 date.
During the course of her trial testimony, Mercado stated that she wrote a letter, dated February 26, 2010, thanking Cabatic for referring the child to Mercado, and attaching "consult/follow-up visit notes." Mercado denied being aware of the fact that Claudialee had been dead for more than one month when she wrote the letter. When asked whether she decided to send her chart to Cabatic "[j]ust [out] of the blue," Mercado answered, "[y]ou have a letter also to request for the record." Mercado acknowledged that the plaintiff's attorney's firm sent a letter asking for the medical records and that Mercado's sister, who was Mercado's office manager, sent a certified copy of the records to the firm. Mercado was asked, and answered, in part:
"Q. We sent a letter asking for records, okay, but on February 26 you sent a copy of the chart you said in response to having gotten the letter from me. You sent a copy of your chart to Dr. Mercado?
"A. No, Dr. Cabatic.
"Q. Dr. Cabatic, I apologize. And then a couple of weeks later you sent it to us, is that correct?
"A. Yes.
"Q. You did send everybody the same chart?
"A. Yes.
"Q. In that letter you have a typewritten report. I'm going back to your chart. Now, you have the typewritten report, this to Dr. Cabatic, you have a typewritten report and you have your December—your October 31, 09, two-page typewritten report of the visit, is that right?
"A. Yes.
"Q. You didn't type that when my client was there, when [the child] was there, did you?
"A. I had scribbled. Also, I have a paper there. I do take like history of the patient and then type them later.
"Q. How much later?
"A. When you ask the record, sir.
"THE COURT: When later?
"Q. When I asked for the records? So you type them after [the child] died?
"A. When I have all the information. It's the reference.
"Q. Let me try to understand this, you indicated that you got a letter from my office, clearly we weren't in this case until after she died. You get a letter from my office and then you sat down said, oh, I better type all these reports, is that what happened?
"A. No."
Mercado then gave testimony to the effect that she saved the original, handwritten notes memorializing her first visit with Claudialee, but, after receiving the letter from the plaintiff's attorney's firm, she destroyed the original, handwritten notes memorializing her two subsequent [*4]visits with the child. Mercado was asked, and answered:
"Q. Now, you told us that you created the typed written part for the Halloween, the 10/31 visit after you got the letter from my office, did you do all three of them at the same time?
"A. Yes.
"Q. So this one was done without the help of any squiggly notes; is that right?
"A. No.
"Q. No?
"THE COURT: You had notes?
"THE WITNESS: I have like piece of paper, but after typing—
"THE COURT: Where is it[?]
"THE WITNESS:—I throw them out. After typing I will throw them out.
"THE COURT: Four months later you throw them out?
"THE WITNESS: Yes."
Later, she was asked, and answered:
"Q. It's a history that you have to type and, Doctor, this one, all of these are done after you get the letter from the lawyer, is that right?
"A. Yes.
"Q. Could you refer to your notes, your scribble notes for 12-12?
"A. I don't have it here.
"Q. You don't have it here or you don't have it?
"A. I don't have it.
"Q. You didn't have it at the deposition, you didn't have it when your sister sent us the chart, they have all been thrown out, destroyed?
"A. It's a scribble, so it's just a piece of paper.
"Q. But you saved the first scribble?
"A. It's official registration form."
The child's mother testified that at the conclusion of Mercado's December 12, 2009, visit with the child, Mercado instructed the person scheduling appointments to make an appointment for the child to see Mercado again in two months; the child's mother was given, and retained, an appointment card with the date February 13, 2010. The appointment card bearing Mercado's office information, the child's name, and the follow-up date, February 13, was admitted into evidence. Mercado acknowledged that the typewritten record for the December 12, 2009, visit indicated that the child was to return in four weeks, while the appointment card indicated that the child was to return on February 13, 2010, that date being roughly nine weeks after December 12, 2009. Mercado offered no explanation for the discrepancy between the follow-up date indicated in the typewritten [*5]record and the follow-up date indicated on the appointment card.
The plaintiff's expert physician, Craig Alter, explained the differences between type 1 diabetes and type 2 diabetes. In type 1 diabetes, the body's immune system attacks the part of the pancreas that makes insulin. Type 2 diabetes was related to a person's weight. In type 2 diabetes, the body produced insulin, "just not enough to get the job done, sometimes called insulin resistance, that leads—can lead to diabetes. But it's not because they cannot make insulin at all, big difference." Weight loss and exercise were crucial to treating a person who had type 2 diabetes, and insulin was often required as well. "In Type 1 if we don't give them insulin then they will die." Alter explained that although a growing number of children were being diagnosed with type 2 diabetes, "[i]f you tell me there is a five year old with diabetes, the chance they have Type 1 is probably 99.99 percent. If you tell me—they are obese I would say, okay, the chance is 99.7 percent it's almost definitely Type 1."
Alter opined that Claudialee's death was caused by complications from type 1 diabetes. Alter believed that Mercado departed from the accepted standard of care by not teaching the child's family about symptoms of diabetes—such as weight loss, tiredness, lightheadedness, excessive thirst, and excessive urination—and by not recommending that Claudialee's family perform home testing to measure the child's blood sugar and ketones. He also faulted Mercado for assuming that the child was developing type 2 diabetes and not even considering that the child was developing type 1 diabetes.
Over the objection of Mercado's attorney, the Supreme Court agreed to submit to the jury the question of whether punitive damages should be awarded against Mercado. The court instructed the jury on punitive damages, in part:
"The burden is on the plaintiff to prove that Arlene Mercado, MD maliciously destroyed her handwritten notes pertaining to her examination of [the child] after receiving a letter from plaintiff's attorney. To this we are referring to the scribble notes. This means evidence that satisfies you that there is a high degree of probability that there was malice, as I will define for you.
"If you decide for the plaintiff, it's not enough to find that there is a preponderance of the evidence in the plaintiff's favor. . . . I explained that to you previously, but here a party must establish their case by clear and convincing evidence. That means they must prove to you that the evidence makes it highly probable that what they claim is what actually happened.
"If, upon all the evidence, you are satisfied that there is a high probability, you must decide for the plaintiff. If you are not satisfied that there is such a high probability, you must decide on this question for the defendant, Dr. Mercado.
"The plaintiff contends that defendant Mercado's act in destroying scribble notes after being notified by plaintiff's letter was a malicious act requiring the imposition of punitive damages.
"Dr. Mercado contends that she had a reasonable excuse for disposing of her scribble notes from her 11/14/09 exam and the 12/12/09 exam and that she merely utilized the scribble notes and typed them up when asked for copies of her records. The typed notes essentially replaced her scribble notes.
"In addition to awarding damages to compensate the estate of [the child] for her death, you may but are not required to award the estate punitive damages if you find that the act of the defendant, Dr. Mercado, was malicious.
"Punitive damages may be awarded for conduct that shows a high degree of immorality and indifference to civil obligations. The purpose of punitive damages is not to compensate the estate but to punish the defendant, Dr. Mercado, for malicious acts and, therefore, to discourage Dr. Mercado and other doctors from acting in a similar way in the future.
"An act is malicious when it is done deliberately, with knowledge of the plaintiff's rights and with the intent to interfere with those rights. If you find that Arlene Mercado's acts were not malicious, you need proceed no further in your deliberations on this issue."
The jury found that Mercado departed from accepted medical practice in the diagnosis, care, or treatment of Claudialee, and that this departure was a substantial factor in causing the injury that resulted in the child's death. The jury awarded damages in the sums of $400,000 for the child's pain and suffering and $100,000 for monetary loss sustained as a result of the child's death. Additionally, the jury found that the plaintiff was entitled to punitive damages against Mercado. Following a separate trial on the amount of punitive damages to be awarded, the jury awarded punitive damages against Mercado in the sum of $7,500,000.
In response to an oral application by Mercado's attorney, the Supreme Court instructed the parties to make written submissions on the issue of punitive damages. Thereafter, Mercado, in effect, moved pursuant to CPLR 4404(a) to set aside the jury verdict on the issue of punitive damages and for judgment as a matter of law dismissing the demand for punitive damages, or, in the alternative, to set aside the jury verdict on the issue of punitive damages as contrary to the weight of the evidence or in the interest of justice, and for a new trial on the issue of punitive damages, or, in the alternative, to set aside the jury verdict on the issue of punitive damages as excessive.
In an order entered April 7, 2014, the Supreme Court, in effect, granted that branch of Mercado's motion which was to set aside the jury verdict on the issue of punitive damages as excessive only to the extent of ordering a new trial as to punitive damages unless the plaintiff stipulated to a reduction of the principal sum of the punitive damages award from $7,500,000 to $1,200,000, and otherwise denied Mercado's motion.
Mercado appeals, arguing that the Supreme Court erred in submitting the issue of punitive damages to the jury, that the jury's verdict on punitive damages was not supported by legally sufficient evidence and was contrary to the weight of the evidence, that the verdict on punitive damages must be set aside in the interest of justice because of improper summation comments made by the plaintiff's attorneys, and that the award of punitive damages, even as reduced, was excessive. The plaintiff cross-appeals, arguing that the jury's award of punitive damages should not have been reduced.
Punitive Damages for Destroying Medical Records
We first address Mercado's contention that, as a matter of law, her act of destroying the original records of her treatment of the child cannot support an award of punitive damages. Mercado argues that her destruction of the original records did not contribute to causing the child's death and did not prevent the plaintiff from successfully prosecuting this action.
An award of punitive damage serves the dual purpose of punishing the offending party for wrongful conduct and deterring others from engaging in similar conduct (see Chauca v Abraham, ____NY3d____, 2017 NY Slip Op 08158 [2017]; Ross v Louise Wise Servs., Inc., 8 NY3d 478, 489; Krohn v New York City Police Dept., 2 NY3d 329, 335; Solis-Vicuna v Notias, 71 AD3d 868, 871). Punitive damages have been described as a " hybrid between a display of ethical indignation and the imposition of a criminal fine,'" and reflect the community's condemnation of one who wilfully causes hurt or injury to another (Home Ins. Co. v American Home Prods. Corp., 75 NY2d 196, 203, quoting Reynolds v Pegler, 123 F Supp. 36, 38 [SD NY], affd 223 F2d 429 [2d Cir]; see Thoreson v Penthouse Intern., Ltd., 80 NY2d 490, 497). Such damages are not designed to compensate the plaintiff for the injuries he or she has suffered, but "as punishment for gross misbehavior for the good of the public" (Home Ins. Co. v American Home Prods. Corp., 75 NY2d at 203; see Ross v Louise Wise Servs., Inc. 8 NY3d at 489; Chiara v Dernago, 128 AD3d 999, 1003; see also Prosser & Keeton, Torts § 2 at 9 [5th ed 1984] [punitive damages "are given to the plaintiff over and above the full compensation for the injuries, for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example"]).
In New York, a demand for punitive damages usually arises in the context of an action to recover damages for intentional torts, such as fraud, libel, or malicious prosecution, and "therefore the availability of punitive damages is often discussed in terms of conduct that is intentional, malicious, and done in bad faith" (Randi A. J. v Long Is. Surgi-Ctr., 46 AD3d 74, 80). [*6]However, "[c]ourts in this state have long recognized that those who, without specifically intending to cause harm, nevertheless engage in grossly negligent or reckless conduct showing an utter disregard for the safety or rights of others, may also be deserving of the imposition of punitive damages" (id. at 81). In a medical malpractice action, punitive damages may be recovered where the defendant's conduct "evinces a high degree of moral culpability or willful or wanton negligence or recklessness" (Dmytryszyn v Herschman, 78 AD3d 1108, 1109; see Pellegrini v Richmond County Ambulance Serv., Inc., 48 AD3d 436, 437; Randi A.J. v Long Is. Surgi-Center., 46 AD3d 74, 80).
In this case, the Supreme Court instructed the jury that it could award punitive damages if it found that the plaintiff proved, by clear and convincing evidence, that Mercado "maliciously destroyed her handwritten notes pertaining to her examination of [the child] after receiving a letter from plaintiff's attorney." The court charged the jury that "[a]n act is malicious when it is done deliberately, with knowledge of the plaintiff's rights and with the intent to interfere with those rights." Thus, the first question we must answer is whether a plaintiff may recover punitive damages for a medical professional's act of altering or destroying medical records in an effort to evade potential medical malpractice liability. Courts that have considered this issue both in New York and in other states have reached differing conclusions.
For example, in Devadas v Niksarli (2009 NY Slip Op 30922[U] [Sup Ct, NY County]), the Supreme Court, New York County, denied the plaintiffs leave to amend their complaint to seek punitive damages against an ophthalmologist who had allegedly tampered with the injured plaintiff's medical records. In concluding that the proposed amendment lacked merit, the court noted that there was no evidence that the medical treatment provided by the defendant ophthalmologist was so wantonly dishonest, grossly indifferent to patient care, or so malicious or reckless as to sustain an award of punitive damages. The court further reasoned that the defendant's conduct in allegedly tampering with the medical records could not support a claim for punitive damages because it occurred subsequent to the alleged malpractice, and thus did not arise from the medical treatment provided to the injured plaintiff.
To similar effect is Whittlesey v Espy (1996 WL 689402, 1996 US Dist LEXIS 17638 [SD NY, No. 96 Civ. 0671 (BSJ)]), a memorandum and order of the United States District Court, Southern District of New York. In Whittlesey, the plaintiff moved for leave to amend her complaint to include a demand for punitive damages based on allegations that the defendant physician, after learning of the plaintiff's intent to pursue the case, intentionally added to and altered the plaintiff's medical records and then repeatedly denied that he had done so. The District Court stated that in New York, a plaintiff's entitlement to punitive damages could only arise in connection with the tortious act about which the plaintiff complained. The court then concluded that since the plaintiff sought to support her punitive damages claim "not with behavior connected to the alleged malpractice, but with conduct occurring after the alleged tort transpired," she could not recover such damages. The court added that while evidence of the alleged alterations might be admissible at trial or properly be the subject of a sanctions application, they could not support a claim for punitive damages (see 1996 WL 689402, *1, 1996 US Dist LEXIS 17638, *1).
The Ohio Supreme Court reached a contrary conclusion in Moskovitz v Mt. Sinai Med. Ctr. (69 Ohio St 3d 638, 653, 635 NE2d 331, 344), holding that punitive damages could be awarded in a medical malpractice action upon a showing of "actual malice." The court found that "actual malice" could be demonstrated by evidence that a doctor intentionally altered, falsified, or destroyed medical records to avoid liability for his or her medical negligence, regardless of "whether or not the act of altering, falsifying or destroying records directly causes compensable harm" (69 Ohio St 3d at 653, 635 NE2d at 344). In reaching its conclusion, the court emphasized that the act of altering or destroying records to avoid liability "is particularly deserving of punishment in the form of punitive damages and . . . a civilized society governed by rules of law can require no less" (69 Ohio St 3d at 651, 635 NE2d at 343).
Two New York appellate cases also suggest that a medical professional may be subject to punitive damages for actions committed in relation to medical records in an attempt to evade potential malpractice liability. In Abraham v Kosinski (251 AD2d 967) (hereinafter Abraham I), the plaintiff commenced an action against the defendant physician seeking damages for medical malpractice, fraud, gross negligence or recklessness, and an award of punitive damages. The defendant moved to dismiss the fraud and gross negligence or recklessness claims for failure to state a cause of action, and to strike the claim for punitive damages. The Supreme Court denied the defendant's motion, and the Appellate Division, Fourth Department, affirmed. The Fourth [*7]Department concluded that the claims alleging fraud and gross negligence or recklessness were sufficient to state a cause of action because the damages flowing from those alleged acts included the plaintiff's continuation of courses of treatment that were ineffective or may not have been pursued but for the alleged fraud, and the plaintiff's deprivation of courses of treatment that would have been pursued but for the fraudulently withheld information. With respect to punitive damages, the Fourth Department briefly noted that the plaintiff's allegations that the defendant "intentionally, willfully and wantonly withheld medical records and information from plaintiff in order to avoid the malpractice claim are sufficient to support the claim for punitive damages" (id. at 968).
The defendant physician in that action subsequently moved for partial summary judgment dismissing the plaintiff's causes of action to recover damages for fraud and gross negligence, and the claim for punitive damages. The Supreme Court granted the defendant's motion, finding that the plaintiff had sustained no damages that were separate and distinct from those caused by the alleged malpractice. In Abraham v Kosinski (305 AD2d 1091) (hereinafter Abraham II), the Fourth Department held that the defendant's motion had been properly granted. With respect to the fraud cause of action, the Fourth Department noted that the record established that the plaintiff neither pursued ineffective or inappropriate treatment nor elected not to pursue appropriate treatment in reliance upon the alleged fraud (see id. at 1092). The Fourth Department further found that because the plaintiff relied on the same conduct of the defendant, namely, the allegedly fraudulent concealment of a bone scan report, as the basis for the cause of action alleging gross negligence, that cause of action had also been properly dismissed (see id.). The Fourth Department then added that "[i]n the absence of a separate cause of action for fraud or gross negligence, there is likewise no basis for an award of punitive damages and thus the court also properly dismissed that claim" (id.).
In Marsh v Arnot Ogden Med. Ctr. (91 AD3d 1070), the Appellate Division, Third Department, later relied upon Abraham I in support of the proposition that "[w]illful failure to disclose pertinent medical information may be sufficient to support punitive damages when undertaken to evade a malpractice claim" (id. at 1072). In Marsh, the decedent was mistakenly given an insulin-reducing medication that had not been prescribed for him. The plaintiff alleged, and medical records confirmed, that the decedent's medical chart was not updated to reflect that mistaken administration of medicine until four months after the decedent's death. Noting that no explanation for the delay had been offered, and no pretrial discovery had taken place, the Third Department concluded that dismissal of the punitive damages claim was premature where, as there, the party opposing the motion had not had an adequate opportunity to conduct discovery into issues in the moving party's knowledge.
On consideration of the above authority, we now hold that where, as here, a plaintiff recovers compensatory damages for a medical professional's malpractice, a plaintiff may also recover punitive damages for that medical professional's act of altering or destroying medical records in an effort to evade potential medical malpractice liability. Allowing an award of punitive damages for a medical professional's act of altering or destroying medical records in an effort to evade potential medical malpractice liability will serve to deter medical professionals from engaging in such wrongful conduct, punish medical professionals who engage in such conduct, and express public condemnation of such conduct. Thus, the Supreme Court did not err in submitting the issue of punitive damages to the jury.
We reject Mercado's contention that punitive damages cannot be recovered because her destruction of original medical records did not contribute to causing Claudialee's death. Of course, a demand for punitive damages possesses no viability absent its attachment to a substantive cause of action. But here, the jury found that Mercado committed malpractice in her treatment of the child. That Mercado destroyed the original records after Claudialee died does not mean that punitive damages were awarded for conduct unconnected to the malpractice. The award of compensatory damages for Mercado's departure from the standard of care that was a substantial factor in causing injury that resulted in Claudialee's death served as a foundation for the award of punitive damages for Mercado's attempt to evade liability for that malpractice by destroying original records of her treatment of the child.
We also reject Mercado's contention that punitive damages cannot be recovered because her destruction of original records did not prevent the plaintiff from successfully prosecuting this action. The fact that the plaintiff was able to prove the medical malpractice cause of action against Mercado, despite Mercado's destruction of original records, should not insulate Mercado from liability for punitive damages. Undesirable results likely would flow from a conclusion that [*8]punitive damages cannot be awarded for the destruction of medical records in an effort to evade liability where a plaintiff is able to establish liability nonetheless; specifically, medical professionals fearing malpractice liability might feel emboldened to alter or destroy medical records, knowing that they will face no added liability in tort. Indeed, it has been observed that "[i]f the act of altering and destroying records to avoid liability is to be tolerated in our society, we can think of no better way to encourage it than to hold that punitive damages are not available" in such circumstances (Moskovitz v Mt. Sinai Med. Ctr., 69 Ohio St 3d at 651, 635 NE2d at 343).
Amicus curiae argues that there exist numerous adverse consequences, such as discipline by the Office of Professional Medical Conduct, for a physician who fails to maintain medical records in accordance with Education Law § 6530(32), and that these consequences are sufficient to deter such conduct by physicians. Additionally, amicus curiae points out that spoliation sanctions may be imposed under appropriate circumstances. However, the possibility of other consequences, such as professional disciplinary action or spoliation sanctions, should not preclude medical professionals from being subject to punitive damages for altering or destroying medical records in an effort to evade potential medical malpractice liability. We note that in Whittlesey, the District Court pointed out that the New York State Board of Regents is empowered to bring disciplinary proceedings against doctors who fail to maintain accurate medical records, and concluded that "[t]his adequately protects plaintiffs from, and provides a mechanism to punish, doctors who seek to escape medical malpractice liability by altering records" (Whittlesey v Espy, 1996 WL 689402, *1 n 4, 1996 US Dist LEXIS 17638, *1 n 4 [citations omitted]). However, the present case illustrates that the availability of disciplinary proceedings is not sufficient to protect plaintiffs from such conduct, since Mercado was clearly not deterred by the possibility of such disciplinary action.
Legal Sufficiency and Weight of the Evidence
We next turn to Mercado's contentions that the evidence was legally insufficient to support the jury's award of punitive damages, and that the award of punitive damages was contrary to the weight of the evidence.
"For a reviewing court to determine that a jury verdict is not supported by legally sufficient evidence, it must conclude that there is simply no valid line of reasoning and permissible inferences' by which the jury could have rationally reached its verdict on the basis of the evidence presented at trial'" (Sokolik v Pateman, 114 AD3d 839, 840, quoting Cohen v Hallmark Cards, 45 NY2d 493, 499; see Szczerbiak v Pilat, 90 NY2d 553, 556). Moreover, "a jury verdict should not be set aside as contrary to the weight of the evidence unless the jury could not have reached the verdict by any fair interpretation of the evidence" (Sokolik v Pateman, 114 AD3d at 840; see Lolik v Big V Supermarkets, 86 NY2d 744, 746).
Applying these standards, we determine that there was legally sufficient evidence to support the jury's verdict on punitive damages, and, additionally, the jury's verdict awarding punitive damages was not contrary to the weight of the evidence.
It is undisputed that Mercado destroyed the original, handwritten records of two of the three occasions she treated Claudialee. At trial, Mercado testified that after receiving a letter from the plaintiff's attorney, she typed up her handwritten or "scribble" notes of the three occasions she saw the child; she kept the handwritten record of the first visit with the child, considering it the "official registration form," but threw out her handwritten records of the second and third visits. This trial testimony was at odds with Mercado's deposition testimony to the effect that the typewritten record was made on the date of Claudialee's first visit.
The typewritten record of the October 31, 2009, visit included information not reflected in the handwritten record of that visit. The typewritten record of that visit indicated, "[n]o polyuria, no polydipsia." The handwritten record did not indicate that Mercado asked about polyuria, excessive urination, or polydipsia, excessive thirst; excessive urination and excessive thirst both being diabetes symptoms. Further, it appears that a finding of acanthosis nigricans, which can be a sign of insulin resistance, was indicated in the typewritten record but not in the handwritten record.
Further, there was a discrepancy regarding when the child was to return to see Mercado following the December 12, 2009, visit. The typewritten record of the December 12, 2009, visit indicated, "[n]ext visit to record random BG's fasting and 2 hour post meal. TCB in 4 weeks." However, the appointment card, which the child's mother retained and which was admitted into evidence at trial, indicated that the child's next appointment with Mercado was scheduled for [*9]February 13, 2010. Notably, a return visit four weeks from December 12, 2009, would have been prior to the child's illness that began on January 21, 2010, and resulted in her death from diabetic ketoacidosis. Mercado offered no explanation for this discrepancy.
Because of Mercado's actions, the contents of the handwritten records documenting two of the three occasions Mercado treated the child cannot be proven. It was, however, proven that Mercado destroyed these original, handwritten records after receiving a letter from the plaintiff's attorney. Further, it was proven that information was added to the typewritten record of the October 31, 2009, visit, and that there existed an important discrepancy, regarding when the child was to follow up with Mercado, between the typewritten record of the December 12, 2009, visit and the appointment card. Based on the trial evidence, there is a valid line of reasoning and permissible inferences by which the jury could have rationally reached its verdict on the issue of punitive damages, and, further, the jury could have reached its verdict awarding punitive damages by a fair interpretation of the evidence.
Remaining Issues
We are unpersuaded by Mercado's contention that a new trial on the issue of punitive damages is warranted in the interest of justice on the ground that the plaintiff's attorney made improper summation comments. Defense counsel did not timely object to the challenged comments or request curative instructions (see Reilly v St. Charles Hosp. & Rehabilitation Ctr., 143 AD3d 692, 694; Frederic v City of New York, 117 AD3d 899, 900). To the extent any alleged error was preserved for appellate review, reversal is not required on this ground.
However, the punitive damages award is excessive. The United States Supreme Court has instructed courts reviewing punitive damages to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases" (State Farm Mut. Automobile Ins. Co. v Campbell, 538 US 408, 418; see BMW of North America, Inc. v Gore, 517 US 559, 575; see also Solis-Vicuna v Notias, 71 AD3d 868, 871). "[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process" (State Farm Mut. Automobile Ins. Co. v Campbell, 538 US at 425). On consideration of the guideposts, the amount of punitive damages awarded is excessive to the extent indicated.
Accordingly, the order is modified, on the facts and in the exercise of discretion, by deleting the provision thereof granting that branch of the motion of the defendant Arlene B. Mercado which was to set aside the jury verdict on the issue of punitive damages as excessive to the extent of ordering a new trial as to punitive damages unless the plaintiff stipulated to a reduction of the principal sum of the punitive damages award from $7,500,000 to $1,200,000, and as so modified, the order is affirmed, and the matter is remitted to the Supreme Court, Queens County, for a new trial on the issue of punitive damages unless, within 30 days after service upon the plaintiff of a copy of this opinion and order, the plaintiff shall serve and file in the office of the Clerk of the Supreme Court, Queens County, a written stipulation consenting to reduce the punitive damages award from the principal sum of $7,500,000 to the principal sum of $500,000; in the event that the plaintiff so stipulates, then the order, as so amended, is affirmed.
HALL, AUSTIN and SGROI, JJ., concur.
ORDERED that the order is modified, on the facts and in the exercise of discretion, by deleting the provision thereof granting that branch of the motion of the defendant Arlene B. Mercado which was to set aside the jury verdict on the issue of punitive damages as excessive to the extent of ordering a new trial as to punitive damages unless the plaintiff stipulated to a reduction of the principal sum of the punitive damages award from $7,500,000 to $1,200,000; as so modified, the order is affirmed, without costs or disbursements, and the matter is remitted to the Supreme Court, Queens County, for a new trial on the issue of punitive damages unless, within 30 days after service upon the plaintiff of a copy of this opinion and order, the plaintiff shall serve and file in the office of the Clerk of the Supreme Court, Queens County, a written stipulation consenting to reduce the punitive damages award from the principal sum of $7,500,000 to the principal sum of $500,000; in the event that the plaintiff so stipulates, then the order, as so amended, is affirmed, without costs or disbursements.
ENTER:
Aprilanne Agostino
Clerk of the Court