Kent v Jones (2025 NY Slip Op 51479(U))

[*1]

Kent v Jones

2025 NY Slip Op 51479(U)

Decided on September 19, 2025

Supreme Court, Queens County

Dunn, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 19, 2025
Supreme Court, Queens County

Donna Kent, individually and as personal Representative of 
 the late Sandor Szabo, Plaintiff,

against
Jamill Jones, Defendant.

Index No. 712125/2020

For the Plaintiff:
John Pierce Law
Attorneys for the Plaintiff
21550 Oxnard St — 3rd Floor
Woodland Hills, CA 91367
By: Andrew Green, Esq.
For the Defendant:
Quintairos, Prieto, Wood, & Boyer, P.A.
Attorneys for the Defendant
233 Broadway, Suite 2120
New York, New York 10279
By: Tanya M. Branch, Esq.

Scott Dunn, J.

I. INTRODUCTION
An early summer morning in August 2018, on a street in Long Island City, Queens. A morning that would end with the tragic and senseless death of Sandor Szabo—a 35-year-old man entering the prime of his life. And leave a courageous mother, here to seek "justice", with a life of relentless and endless pain. And forever damage the reputation of a college basketball coach with unlimited potential.
Here, we are called upon to consider the appropriateness of a measure of damages for Sandor Szabo's death. But the task, in the ultimate sense, is a hopeless one, as there is no measure of monetary damages that could ever compensate for his loss. That loss is immeasurable. And compounding this fact, is that the law relating to damages in the situation present here, where the decedent was single and apparently was rendered instantaneously unconscious, is particularly unfriendly.
As such, any damages awarded below are not intended, nor could they ever be intended, to place a monetary value on Sandor Szabo's life. Rather, any damages awarded are the result of what the Court believes to be those established within the boundaries of the law. But the "justice" that Plaintiff seeks could not, in any event, ever come from a monetary award. But perhaps the manner in which these proceedings were conducted, and Plaintiff's opportunity to speak about her son, to all, including the Defendant, has changed things. Perhaps.
II. BACKGROUND
The Plaintiff DONNA KENT, individually and as personal Representative of the late Sandor Szabo ("Plaintiff"), commenced this action on August 4, 2020, against JAMILL JONES ("Defendant" or "Jones") and Wake Forest University, relating to the death of Sandor Szabo ("Sandor"). That death occurred after Jones struck Sandor with a single punch, after Sandor had approached Jones' vehicle, while Jones was inside. Following the criminal trial before a jury held in January-February 2020, Jones was convicted of third-degree assault, a class A misdemeanor, for the punch that resulted in Sandor's death.
The complaint in this civil case contains five causes of action against Jones and Wake Forest University, including claims of wrongful death, intentional infliction of emotional distress, assault, battery, and negligence (NYSCEF Doc. No. 2). The claims against Wake Forest University were ultimately dismissed (NYSCEF Doc. No. 68).
By Order filed April 1, 2022, a default judgment was granted against Jones "only on the issue of liability" and an inquest was ordered by the Court (NYSCEF Doc. No. 92). That inquest was held by this Court on May 6, 7, and 21 (see Transcript of Proceedings ["Tr."]; NYSCEF Doc. Nos. 139 and 140). What follows, is the decision and order of the Court relating to the Inquest.
III. THE CLAIMS OF THE PARTIES
Liability having been established, the sole issue before the Court was that of damages (see Rokina Opt. Co., Inc. v Camera King, Inc., 63 NY2d 728, 730 [1984]; Arluck v Brezinska, 180 AD3d 634, 634-35 [2d Dept 2020]). However, based on Plaintiff's damage claims, an evaluation of the factual basis for liability is necessary.
In sum, Plaintiff requests $1 million dollars for Sandor's preimpact terror and conscious pain and suffering, $3 million dollars for Donna Kent's pecuniary losses, $2.43 million dollars in statutory interest and $12 million dollars in punitive damages, for a total of $18.43 million dollars (see Plaintiff's Post Inquest Brief on Damages ["Pl. Br."]; NYSCEF Doc. No. 137 at p. 3). In response, Defendant claims that Plaintiff failed to establish evidence of preimpact terror, conscious pain and suffering, or any comprehensive pecuniary loss, or that punitive damages are warranted (see Defendant's Post Inquest Brief on Damages ["Def. Br."]; NYSCEF Doc. No. 138).
IV. THE INQUEST
At the Inquest of this matter, Plaintiff presented two witnesses. Plaintiff's first witness was Robert Kent ("Dr. Kent"), the husband of Donna Kent and the stepfather of Sandor. Dr. Kent testified in glowing terms of Sandor's character and personality and the special and caring relationship that Sandor had with his mom, Donna Kent. He testified further to the pain and heartbreak that Donna Kent has experienced since Sandor's death, that she is depressed a lot of the time and cries a lot (Tr. at pp. 18-22). He further testified that his wife had occupied a prominent position in his business and that because of her inability to function in that role, the business had lost considerable revenue (Tr. at pp. 24-25). Dr. Kent testified that Donna Kent felt [*2]that the justice system had not treated her son fairly and that she was just looking for some public acknowledgment and for some peace (Tr. at pp. 27-29).
The next witness was Donna Kent ("Ms. Kent" or "Donna Kent"), the mother of Sandor. She testified that Sandor was her "beautiful son, [her] first born boy" and her "best friend" (Tr. at p. 55). She provided numerous examples of just how special their relationship was and how Sandor showed his love for her, and how they were in constant contact (Tr. at pp. 56-59). She testified to Sandor's closeness to the family and how different family gatherings were now without him (Tr. at pp. 60-61). She testified that Sandor's employer indicated that he was a superstar in the industry and was slated to make $325,000 (Tr. at p. 68 and Plaintiff's Inquest Ex. 1).
Ms. Kent then testified about how Sandor's death had affected her emotionally, the many things in life that reminded her of Sandor and that it felt like she had an elephant on her chest all day (Tr. at pp. 74-75). She further testified on how Sandor's death had dramatically affected her health, both mentally and physically, that she avoided people, and they avoided her, because she is the mom whose son was murdered (Tr. at pp. 75-76). Further, Ms. Kent explained that her relationship with her husband has been compromised because she just can't move on (Tr. at pp. 76-77, 78-79). And finally, that she was in therapy (Tr. at p. 76 and Plaintiff's Inquest Ex. 5).
Ms. Kent testified that Sandor had communicated to her that as she got older, that he was going to take care of her (Tr. at p. 79). In terms of expenses, she testified that there were funeral and burial expenses and probate and attorney expenses as well (Tr. at pp. 79, 83-84 and Plaintiff's Inquest Ex. 4). She also testified as to expenses relating to the criminal trial that had been held in connection with this matter and the current civil inquest as well (Tr. at pp. 80-83 and Plaintiff's Inquest Exs. 2 and 3).
Ms. Kent concluded her testimony by stating that "Sandor deserved to live" and that she just wanted "Jones to realize what a beautiful, beautiful person he took from us, for no reason. I feel like there has been no remorse, and I just want him to know that Sandor was so kind, if Sandor would have seen him on a dark street, being assaulted by someone even despite the difference in size, Sandor would have gone to protect him, not knowing who he was" (Tr. at p. 88). Defendant did not cross-examine Ms. Kent. Rather, counsel stated the following: "On behalf of my client, Jamil Jones, and his attorneys, we express a profound, deep sorrow for your loss in this incident. There is remorse and there is nothing that we can do at this point to give you peace for your pain but we hope that when this process is over you find that peace. We are deeply sorry" (Tr. at pp. 89-90).
Following the testimony of Ms. Kent, the trial transcripts of three individuals from Jones' criminal trial were presented by Plaintiff and admitted into evidence. At the criminal trial Hamidul Ghani ("Ghani") testified that he had encountered Sandor on the night of the incident (see Transcript of Hamidul Ghani, Plaintiff's Inquest Ex. 6-Part 1 ["Ghani Tr."] at p. 16). Ghani testified that Sandor was obviously drunk and was banging on his car. Ghani suspected that Sandor thought that he was an Uber driver (Ghani Tr. at p. 17). Ghani parked his vehicle and walked away and went inside to his apartment (Ghani Tr. at pp. 17, 19). He went back downstairs about twenty minutes later and saw Sandor stumbling and hit another car (Ghani Tr. at 20-21). Ghani then saw someone come out of the car that Sandor had hit, chase Sandor who had run away a little bit, and then hit Sandor (Ghani Tr. at pp. 21, 23-25), and walk back to his car (Ghani Tr. at p. 38). Ghani testified that he ran toward Sandor and that Sandor was just laying there, bleeding out of his mouth, ears and nose and was choking on his blood, he was [*3]coughing up blood everywhere, his face was moving but not him (Ghani Tr. at pp. 21, 35).
The next criminal trial transcript admitted into evidence was that of Andres Limonggi ("Limonggi"). He too was present at the incident. Limonggi testified that he also observed an obviously intoxicated Sandor, and tried to help him call a cab. However, and instead, an altercation ensued and Sandor punched Limonggi. Limonggi then put him in a choke hold, but ultimately walked away (see Transcript of Andres Limonggi, Plaintiff's Inquest Ex. 6-Part 2 ["Limonggi Tr."] at pp. 50-52, 57).
Limonggi then testified that he observed Sandor hitting another car, someone getting out of the car, and Sandor getting hit and the sound of him hitting the ground (Limonggi Tr. at pp. 53-54). He further testified that Sandor had positioned himself behind a mailbox, was trying to stay out of trouble and get away from the person who had gotten out of the car, but the guy followed him and he punched him (Limonggi Tr. at p. 55). And, that after he punched Sandor, the puncher turned around and walked away (Limonggi Tr. at p. 56). Limonggi testified that he went over to Sandor and "his mouth was going", that he "looked like he was conscious", that Limonggi was talking to him but that Sandor was not "saying anything" (Limonggi Tr. at p. 54).
Finally, the criminal trial transcript of Dr. Anne Laib ("Dr. Laib") was admitted into evidence. Dr. Laib performed the autopsy on Sandor (see Transcript of Dr. Anne Laib, Plaintiff's Inquest Ex. 7 ["Laib Tr."] at p. 7). She testified that Sandor had two fractures to his skull, swelling in the brain, a sudden rotational injury to the brain, laceration to the left lip and various contusions to the face. Dr. Laib testified that all of these injuries were consistent with being punched in the face (Laib Tr. at pp. 10-24). She also testified that Sandor's blood alcohol content was .39, which is approximately five times above the legal limit (Laib Tr. at p. 32). And finally, Dr. Laib testified that the fact that Sandor's right leg shook a couple of times while he laid on the ground following the impact, was not indicative of conscious movement (Laib Tr. at p. 27).
Lastly, Plaintiff offered into evidence two videos related to the incident. The videos were admitted into evidence as Plaintiff's Inquest Exs. 8 and 9. Plaintiff then rested.
Defendant did not call any witnesses. Rather, Defendant introduced into evidence a document from Safelite Auto, which purportedly showed damage to the back glass window of the car Jones was driving (see Defendant's Inquest Ex. B). Defendant also introduced into evidence a Pre-Pleading Memorandum from his criminal case (see Defendant's Inquest Ex. A). The Memorandum contains 23-character references. In addition, the Memorandum details Defendant's history and background. It highlights a productive life, an individual who has dealt with adversity, Jones' many accomplishments, and the positive influence that he has had on many individuals.
V. LEGAL DISCUSSION
As a preliminary matter, but a matter of great import, the Court stresses again that the damages awarded below are not intended in any way to place a monetary value on Sandor's life. Indeed, Sandor's life is priceless. The Court is however obligated at Inquest with calculating an appropriate award of damages, if any, based on the law and the facts presented. The Court now turns to this duty below.
Initially, under the law of New York, it was not possible to maintain a damages action for wrongful death (Liff v Schildkrout, 49 NY2d 622, 631-632 [1980]). "The result was that it was cheaper for the defendant to kill than injure [the plaintiff]" (Prosser and Keeton, Torts § 127, at 945 [5th ed]).
In 1847, New York adopted a statutory cause of action for wrongful death, now [*4]embodied in EPTL § 5-4.1 (Liff, 49 NY2d at 632). The essence of the cause of action for wrongful death in this state is that the plaintiff's reasonable expectancy of future assistance or support by the decedent was frustrated by the decedent's death (Loetsch v New York City Omnibus Corp., 291 NY 308, 310-311 [1943]). Excluded from recovery are any losses that result from the deprivation of society and companionship (Liff, 49 NY2d at 633-634). Compounding this in the instant matter is that with one exception relevant here relating to preimpact terror, recovery for post-accident pain and suffering available to the estate or the victim, is not allowed where there is no evidence that the decedent was conscious at any time after the occurrence (Phiri v Joseph, 32 AD3d 922 [2d Dept 2006]). With this background, the Court begins its analysis.
A. Pecuniary Damages
First, Plaintiff seeks damages for wrongful death under EPTL § 5-4.3 (Pl. Br. at pp. 8-10). Damages for wrongful death pursuant to § 5-4.3 are limited to the "fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought" (EPTL § 5-4.3; see also Bacchus-Sirju v Hollis Women's Ctr., 196 AD3d 670, 673 [2d Dept 2021]; Vargas v Crown Container Co., 155 AD3d 989, 993 [2d Dept 2017]). "[P]ecuniary loss consisting of loss of support, voluntary assistance, and possible inheritance and other incidental expenses, is recoverable" (Motelson v Ford Motor Co., 101 AD3d 957, 962 [2d Dept 2012]; see also Gonzalez v New York City Hous. Auth., 77 NY2d 663, 668 [1991]; Johnson v Richmond Univ. Med. Ctr., 101 AD3d 1087, 1088 [2d Dept 2012]).
Here, the parties agree that fees for the burial service and plaque, totaling $4,995.00 and $272.00, respectively, are recoverable (Def. Br. at p. 10). In addition, the Court finds that the expenses relating to the decedent's estate and probate thereof, amounting to $11,843.35, are recoverable as well (see Plaintiff's Inquest Ex. 4; EPTL § 11-3.3). However, the request for fees related to the two funeral homes has not been substantiated as no evidence has been presented related to them. Further, Plaintiff's requests for travel-related expenses related to both the criminal and civil inquest are denied, as Plaintiff has presented no authority to establish that such expenses are recoverable.
Plaintiff also seeks damages for pecuniary loss related to Donna Kent's emotional pain and suffering. It is beyond dispute that the loss of Sandor to Ms. Kent remains devastating and is incalculable. However, it is well settled in New York, that pecuniary injuries do not include sorrow or mental anguish or loss of companionship of a child (Smith v. Lehigh Valley R. Co., 177 NY 379, 384 [1904]; Matter of Acquafredda, 189 AD2d 504, 516 [2d Dept 1993]; Devito v Opatich, 215 AD2d 714, 715 [2d Dept 1995]).
Plaintiff also seeks damages for pecuniary injuries related to the decedent's future earning capacity. To this end, Plaintiff must establish that she had a reasonable expectation of support from the decedent and therefore a pecuniary loss (Zelizo v Ullah, 2 AD3d 273 [1st Dept 2003]). Here, other than the singular statement that Sandor was "always going to take care [her]" (Tr. at p. 79), there was no evidence put forward establishing that the nature of the relationship between Sandor and his mother—Donna Kent—involved financial support or that it was set up to provide support in the future, or that Ms. Kent expected or intended to receive financial support from her son. As such, Plaintiff has failed to establish a cognizable pecuniary injury to Ms. Kent, resulting from Sandor's death (see Gonzalez v New York City Housing Authority, 77 NY2d 663, 668 [1991] [plaintiff must establish reasonable expectancy of future assistance or support from decedent]; Matter of Payne v Lehmann, 12 AD2d 940, 940 [2d Dept 1961] ["where (as here) [*5]there is no proof of such [voluntary contributions of support], the only damages recoverable for the wrongful death cause of action under the facts of this case are for funeral expenses"]).
B. Conscious Pain and Suffering and Preimpact Terror
Plaintiff also seeks $1 million dollars for Sandor's preimpact terror and conscious pain and suffering. To recover damages for pain and suffering, a plaintiff must establish consciousnesses any time after the occurrence of the accident (Phiri v Joseph, 32 AD3d 922 [2d Dept 2006]). To establish preimpact terror, there must be evidence from which one might imply that the decedent was aware of an impending serious or grave injury (see McKenna v Reale, 137 AD3d 1533, 1535 [3d Dept 2016]; Santaiti v Town of Ramapo, 197 AD3d 1191, 1194 [2d Dept 2021]).
"Plaintiffs have the threshold burden of proving consciousness for at least some period of time following an accident in order to justify an award of damages for pain and suffering" (Cummins v. Cnty. of Onondaga, 84 NY2d 322, 324—25 [1994]). While the burden can be satisfied by direct or circumstantial evidence, conjecture, surmise, and speculation alone is not enough to sustain a claim (Cummins, 84 NY2d at 325). "Without legally sufficient proof of consciousness following an accident, a claim for conscious pain and suffering must be dismissed" (id.). Here, there is only conclusory testimony that Sandor was briefly conscious after he was punched by the Defendant (see Limonggi Tr. at p. 54). No evidentiary basis of consciousness is provided by the witnesses—Limonggi or Ghani—and no medical opinion is supplied that supports this conclusion (see Cummins, 84 NY2d at 325 [plaintiff's medical expert "supplied inconclusive testimony on this key issue" of whether decedent was conscious following the accident]). Indeed, the only medical testimony provided here is from Dr. Laib who testified in the criminal proceeding that the shaking of Sandor's right leg was not indicative of conscious movement (Laib Tr. at p. 27). Simply put, the evidence provided at the Inquest was insufficient for the Plaintiff to meet the "burden of "proving [Sandor's] consciousness" after being hit by Jones (Cummins, 84 NY2d at 325; see also Zurita v McGinnis, 7 AD3d 618, 619 [2d Dept 2004] ["There was also no evidence presented at trial that the decedent cried out, spoke, or made intentional movements following the [accident]. Hence . . . the plaintiff is not entitled to recover damages for past pain and suffering"]).
The Court reaches a different conclusion with respect to preimpact terror as there is ample evidence that Sandor—who was 5 foot 11 inches tall and weighed 196 pounds (Laib Tr. at p. 27)—experienced preimpact terror before being punched by Jones—who stood undisputedly at 6 foot 5 inches tall and weighed approximately 220 pounds (see Complaint [NYSCEF Doc. No. 1] at ¶¶ 11, 52. Indeed, Limonggi testified that Sandor had positioned himself behind a mailbox, and was trying to "stay out of trouble and get away" from the Defendant (Limonggi Tr. at p. 55). Further, that Sandor was trying to retreat and get away from Jones is confirmed by Ghani (Ghani Tr. at pp. 21-25). Finally, that Sandor was aware of the impending danger he faced is established conclusively by the videos admitted into evidence at the Inquest. Indeed, Sandor is seen turning around as he recognizes that Jones is chasing after him at approximately 1:42 A.M. Sandor then picks up his hand, walks backward to avoid the oncoming Jones, and then braces himself for impact, while staring in fear at the much taller Jones, whose fist is cocked back readying to level a violent blow to Sandor's head (see Plaintiff's Inquests Exs. 8 and 9; see also Boston v Dunham, 274 AD2d 708, 711 [3d Dept 2000] [evidence deceased had a "surprised look" sufficient to establish preimpact terror]; Matter of 91st Street Crane Collapse Litigation, 154 AD3d 139, 154 [1st Dept 2017] ["sheer panic and fear" on decedent's face sufficient to [*6]establish preimpact terror]; Vargas v Crown Container Co., 155 AD3d 989, 993 [2d Dept 2017] [preimpact terror that lasted less than a second is sufficient]; Vatalaro v Suffolk, 163 AD3d 893, 895 [2d Dept 2018] [preimpact terror established where decedent merely "made eye contact" with driver "one second" prior to impact]; Archer v. Parlman, 235 AD3d 1218, 1220 [3d Dept 2025] [video evidence shows that decedent suffered preimpact terror as she raised her hand in anticipation of impact]).[FN1]

"Because pain and suffering awards are not subject to precise quantification, examination of comparable cases" is helpful to determine "reasonable compensation" (Osiecki v Olympic Regional Dev. Auth., 256 AD2d 998, 1000 [3d Dept 1998]; see also Kayes v Liberati, 104 AD3d 739, 741 [2d Dept 2013] ["The reasonableness of compensation must be measured against relevant precedent of comparable cases"] [internal citations and quotation marks omitted]). Here, based on the facts presented, the Court awards damages for preimpact terror in the amount of $200,000. The Court believes that this is the fair amount under the facts of this case and is consistent with case law (see Vargas v Crown Container Co., 155 AD3d 989, 993 [2d Dept 2017] [award of $250,000 found appropriate for pre-impact terror that lasted less than a second]).
C. Punitive Damages
Finally, Plaintiff seeks punitive damages in the amount of $12 million dollars. Punitive damages are available under EPTL § 5-4.3 and are available in this matter since compensatory damages are being awarded (see Hubbel v Trans World Life Ins. Co. of New York, 50 NY2d 899 [1980]). While compensatory damages are intended to have the wrongdoer make the victim whole, punitive damages "are not to compensate the injured party but rather to punish the tortfeasor and to deter this wrongdoer and others similarly situated from indulging in the same conduct in the future" (Ross v Louise Wise Servs., Inc., 8 NY3d 478, 489 [2007]).
"Whether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of the original trier of the facts" (Nardelli v. Stamberg, 44 NY2d 500, 503 [1978]). Conduct justifying an award of punitive damages "'need not be intentionally harmful'" (Gruber v Craig, 208 AD2d 900, 901 [2d Dept 1994], quoting Home Ins. Co. v. Am. Home Prods. Corp., 75 NY2d 196, 204 [1990]). "Punitive damages are warranted where the conduct of the party being held liable evidences a high degree of moral culpability or where the conduct is so flagrant as to transcend mere carelessness, or where the conduct constitutes willful or wanton negligence or recklessness" (Rey v Park View Nursing Home, Inc., 262 AD2d 624, 627 [2d Dept 1999] [internal citations omitted]). Stated differently, in New York, punitive damages are warranted for "conduct having a high degree of moral culpability which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard" (Chauca v Abraham, 30 NY3d 325, 331 [2017] [internal citation and quotation marks omitted]; see also Gruber v Craig, 208 AD2d 900, 901 [2d Dept 1994]); Randi A.J. v Long Is. Surgi-Ctr., 46 AD3d 74, 85 [2d Dept 2007]; Guariglia v Price Chopper Operating Co., Inc., 38 AD3d 1043, 1043 [3d Dept 2007]). Indeed, punitive damages may be awarded where "a defendant's conduct is grossly negligent" (Bennett v [*7]State Farm Fire & Cas. Co., 161 AD3d 926, 929 [2d Dept 2018]). Certainly, "quasicriminal conduct," or "utterly reckless behavior," suffices for an award of punitive damages (Gellman v. Seawane Golf & Country Club, Inc., 24 AD3d 415, 418 [2d Dept 2005]).
Finally, although the Appellate Divisions are split on the requisite standard of proof to impose punitive damages, in the Second Department, "clear and convincing evidence" is required (see 1B NY PJI3d 2:278, at 1010 [2025], citing A.J. v Long Island Surgi-Center, 46 AD3d 74 [2d Dept 2007]; Orange and Rockland Util., Inc. v Muggs Pub, Inc., 292 AD2d 580, 581 [2d Dept 2002]; Chiara v Dernago, 128 AD3d 999, 1003 [2d Dept 2015]).
Here, the Court finds by clear and convincing evidence that Defendant's conduct meets the standard necessary to establish a claim for punitive damages. As a threshold matter, it appears that Sandor was motioning to Jones' car and to Jones as it passed. But rather than continue driving away from Sandor, it appears that Jones stopped his car, and backed it up onto an adjacent street, allowing Sandor to approach the car (see Plaintiff's Inquest Ex. 8). Then, after Sandor approached Jones' car, Sandor clearly moved away from it and walked to the other side of the street. Now, for a second time, Defendant could have driven away or called the appropriate authorities. Any encounter was concluded. However, Defendant did not allow for it to end. Rather, Jones got out of his vehicle and sprinted after Sandor (see Plaintiff's Inquest Ex. 8). And Jones' intent was clear and focused—to hurt Sandor. Yet an additional opportunity was provided to Defendant to halt his menacing pursuit when Sandor positioned himself behind the mailbox and then attempted to move further away. But rather than stop, Jones continued his targeted effort by rearing back his arm with a closed fist and then landing a punch to Sandor's head (see Plaintiff's Inquest Ex. 9). And, as evidenced by the testimony of Dr. Laib, when Jones hit Sandor, he hit him with an extremely severe blow. And then, with his mission accomplished, Jones stood over Sandor, methodically walked away, then looked back at Sandor lying on the ground, turned back towards his vehicle, casually walked away, and left Sandor choking on his blood, to die.
Jones' behavior was not simply "utterly reckless" or "quasi criminal" (Gellman, 24 AD3d at 418). Rather Jones' conduct was, in fact, criminal. Indeed, Jones was convicted by a jury of third-degree assault. Describing Jones' conduct as "mere negligence" or an "impulsive act" (Def. Br. at p. 11) is a considerable understatement and ignores the facts that are there for all to see in the video footage. At a bare minimum Jones' "conduct was grossly negligent" sufficient under these circumstances to warrant an award of punitive damages (Bennett, 161 AD3d at 929). But even more, Jones conduct clearly evinced a "high degree of moral culpability manifest[ing] a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard" (Chauca, 30 NY3d at 331), warranting punitive damages.
In short, under the facts present here, the Court finds that punitive damages are warranted and awards punitive damages in the amount of $1 million dollars which is five times the amount of the compensatory damages awarded—or half the generally accepted upper limit ratio (see Ansonia Assoc. Ltd. Pshp. v Pub. Serv. Mut. Ins. Co., 257 AD2d 84, 87 [1st Dept 1999]), citing BMW of N. Am. v Gore, 517 US 559, 581 [1996] [suggesting 10 to 1 as an outside ratio]; Rosenberg, Minc & Armstrong v Mallilo & Grossman, 8 Misc 3d 394, 403 [Sup Ct, New York 2005], affd 39 AD3d 335 [1st Dept 2007] [upholding an award using "the upper limit" ratio of 10:1 between compensatory and punitive damages]; State Farm Mut. Auto. Ins. Co. v Campbell, 538 US 408, 425 [2003] ["Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in [*8]range of 500 to 1 . . or, in this case, of 145 to 1"]; Pacific Mut Life Ins. Co. v Haslip, 499 US 1 [1991] [a punitive damages award of more than four times the amount of compensatory damages was not excessive]). In the Court's view, this award will also serve the intended purpose of punitive damages "to punish the tortfeasor and to deter this wrongdoer and others similarly situated from indulging in the same conduct in the future" (Ross v Louise Wise Servs., Inc., 8 NY3d 478, 489 [2007]).
VI. CONCLUSION
Donna Kent is remarkable and courageous. She exudes life and presents herself with grace and dignity. But she is consumed, and understandably so, with death, the death of her beloved son Sandor. Her testimony about her son and her relationship with him is nothing short of heartbreaking. And the pain is relentless.
As her husband Dr. Kent, who wants only to comfort her and take her pain away, testified, his wife felt that the justice system had not treated her son fairly and that she was just looking for some public acknowledgment and for some peace. And to that end, she has embraced these proceedings and held nothing back from expressing the unspeakable horror that she has endured, in the hope that this approach will secure at least "some peace."
I sincerely hope that this process provides her with some measure of peace. Indeed, she has admirably sought justice for her son and has had the opportunity to confront Mr. Jones and to tell him, the Court, and the world, just how wonderful a person Sandor was.
Jamil Jones is seeking some peace as well but has adopted the opposite approach. He has tried to separate himself from these proceedings as much as possible. At first, he planned not to appear in court at all but was ordered by the Court to do so. And then, despite the order, Jones failed to appear at the second day of the inquest (May 7, 2025), necessitating an adjournment of the Inquest to May 21, 2025 (Tr. at pp. 43-50). Indeed, Jones elected not to share his side of the story with the Court. Rather, Jones did not testify at all at the Inquest. Instead, Defendant had his counsel express on his behalf his "profound and deep sorrow for [Ms. Kent's] loss" and that "there is nothing we can do at this moment to give you peace for your pain, but we hope that when this process is over you find that peace. We are deeply sorry" (Tr. at pp. 89-90).
What an opportunity it would have been for Mr. Jones to have gotten on the stand and said that. And my suspicion is, that Mr. Jones might also have come off as a unique individual. Indeed, no less than twenty-three individuals filed character references in the underlying criminal case on his behalf. And those references paint the picture of a man who is caring and responsible, and a man of great potential who has overcome much in his life. But Mr. Jones decided, rightly or wrongly, that this was the last place for him to achieve "some peace." And so, we did not hear from him directly and only have the character references to consider.
And finally, the Court also had great hope for these proceedings. When it began, I very much held out the hope that for the first time, the parties could meet and begin a measure of a healing process. Perhaps in time this will happen. Perhaps, however, such things only happen in the movies. But it certainly did not happen at 25-10 Court Square, a space that the parties shared together for a three-day period in May of 2025.
But in the final analysis, whether they run to it or away from it, the parties will forever share a space, a space where something horrific and unimaginable happened, that neither of them ever wanted to happen, and so much want to move past. But my suspicion is, that that space will always be there, in one haunting form or another. But I, for one, truly hope that wonderful and joyous days lie ahead for both Ms. Kent and Mr. Jones, and that both can truly find "some [*9]peace" in their lives. And hopefully, much more than that.
For the reasons set forth above, it is hereby,
ORDERED that pursuant to EPTL § 5-4.3 and § EPTL 11-3.3, Plaintiff is awarded $17,110.35 in pecuniary damages; and it is further,
ORDERED that Plaintiff is awarded $200,000.00 (two hundred thousand dollars) in compensatory damages; and it is further,
ORDERED that Plaintiff is awarded $1 million dollars in punitive damages; and it is further,
ORDERED that consistent with EPTL § 5-4.3, Plaintiff is awarded interest on the $17,110.35 pecuniary damages and $200,000.00 compensatory damages awarded from the date of decedent's death—August 7, 2018 (see Toldeo v Inglesia Ni Christo, 18 NY3d 363 [2012]). Plaintiff is not entitled to interest on the punitive damage award for the period proceeding this Decision and Order (see Stassou v Casini & Huang Const., Inc., 14 AD3d 695, 695-96 [2d Dept 2005]).
This constitutes the Decision and Order of the Court and Plaintiff shall enter Judgment with County Clerk, Judgment Clerk.
Dated: September 19, 2025
Long Island City, New York
SCOTT DUNN, J.S.C.

Footnotes

Footnote 1: Similarly, Defendant's contention that "Szabo's extreme intoxication further undermines the notion that he had the cognitive capacity to comprehend the risk of grave harm" (Def. Br. at p. 8), is belied by the videos.